[763 NYS2d 306]

RICARDO SARJOO et al., Respondents, v NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, Appellant, et al., Defendants.

First Department, August 14, 2003

APPEARANCES OF COUNSEL

*Matthew Gaier* of counsel *(Norman Bard* on the brief; *Kramer, Dillof, Livingston & Moore,* attorneys), for respondents.

*Fay Ng* of counsel *(Pamela Seider Dolgow* on the brief; *Michael A. Cardozo, Corporation Counsel,* New York City, attorney), for appellant.

## OPINION OF THE COURT

Tom, J.

In this appeal, we examine whether the continuous treatment doctrine applies so as to make timely the filing of a notice of claim under General Municipal Law § 50-e during the tolling period for infancy for the statute of limitations, when the section 50-e limitations period had lapsed, and leave to file a late notice of claim was never requested.

The infant plaintiff's parents are citizens of Guyana. His mother, though, has had intermittent residence in the Bronx. On January 23, 1985, plaintiff was born by cesarean section at North Central Bronx Hospital, an affiliate hospital of defendant New York City Health and Hospitals Corporation (HHC). Apparently, the cesarean section was necessitated by fetal distress arising from the umbilical cord being wrapped around his neck. Upon delivery, there was evidence of meconium and he received low Apgar scores. Hospital records indicate that he had suffered birth asphyxia, meconium respiration and additional ailments. Plaintiff was discharged on January 28, 1985. Discharge memoranda indicate follow-up appointments and a referral to the Visiting Nursing Services. There is some evidence that the mother was provided with a set of appointment papers for a follow-up clinic appointment, but the mother states that she received no instructions after discharge. She recalls that a nurse visited once a week for six weeks, but she is not sure what the visits were for. Apparently she was given an appointment for a follow-up examination at the Kennedy Center, but she did not keep her appointment. The mother returned to Guyana with plaintiff in March 1985. There, she took him to a clinic for a six-week checkup, but otherwise sought no medical examinations.

At some point, she received a letter from North Central Bronx Hospital advising her that plaintiff should have a blood test. As a result, she returned with plaintiff to a Bronx clinic in September 1985. She did not recall the reason for the blood

test, but recalled that the outcome was "OK." Plaintiff notes that the clinic's lab slip referencing the September 18, 1985 blood test identified North Central Bronx as his hospital. Defendant argues that the clinic was not at North Central Bronx, though plaintiff tries to connect the two entities by noting that the clinic identified plaintiff by use of plaintiff's North Central Bronx chart number. In any event, the mother subsequently took plaintiff back to Guyana. While in Guyana, the mother took him to a clinic to get vaccinations, and occasionally for colds, and at one point a doctor there indicated that plaintiff had a damaged hand, but no further treatment was ever given, and no further references were made.

Plaintiff's mother recalled that around 1986, she began to notice that plaintiff had difficulties with his left hand and arm, that he could not hold things and had general clumsiness when trying to hold things. She also observed at some point that he had difficulty with his left leg. She did not have this treated in Guyana. Instead, she returned to the United States. Upon her request, she was scheduled for an appointment at North Central Bronx Hospital's Well Baby Clinic on August 12, 1987. This was some 2½ years after plaintiff was discharged following his birth. In the interim, the mother had had no interaction with the hospital as to the medical conditions relating to the child's birth. During that appointment, several diagnostic evaluations were made in connection with probable cerebral palsy, and a pediatric rehabilitation consultation was requested. The mother was scheduled for a November 13, 1987 appointment, and then a January 29, 1988 appointment, but she failed to appear at either appointment. She and plaintiff also failed to appear for a scheduled October 7, 1987 appointment for a rehabilitation and speech language pathology consultation. On November 10, 1987, she and plaintiff also failed to appear for a clinic appointment. She subsequently explained that during this time period, she had returned to Guyana where plaintiff was seen by a doctor who indicated that plaintiff had a damaged hand.

She returned to the United States in 1988. On July 11 and July 21, 1988, plaintiff was examined by the Rehabilitation Medicine Department at North Central Bronx Hospital and was sent for an evaluation. On August 23, 1988, he was given immunization shots and underwent a pediatric neurology evaluation, and was seen at the hospital by a neurologist on September 9, 1988. During these examinations, developmental delays, speech delays, left-sided weaknesses and problems with

coordination were noted. He was seen again at the North Central Bronx Hospital clinic on October 25, 1988, at which time additional appointments were made for speech. The neurology record indicated that "[c]are of child has been very fragmented because Mom moving back and forth to Guyana between New York and there," and also noted that she would be returning to Guyana again in December 1988, and expected to return to New York in March 1989.

Plaintiff and his mother missed another appointment on November 4, 1988, an audiology consultation scheduled for December 22, 1988, and a speech and language consultation scheduled for February 27, 1989. The speech pathologist recorded a notation on February 27, 1989 that a relative had indicated on January 24, 1989 that the mother and plaintiff were not in the United States. Plaintiff did appear for a clinic visit on May 26, 1989, by which time he was attending the United Cerebral Palsy School. A CAT scan was scheduled for June 6, 1989, and an audiology evaluation was scheduled for June 5, 1989. These were done as scheduled, and he returned for further evaluations on June 29, 1989. The audiology evaluation and CAT scan apparently indicated that plaintiff was within normal limits. Medical records indicated that the mother intended to return to Guyana shortly thereafter, that they resided in Guyana for most of the year, and that she was advised at the time that if she chose to relocate to New York the clinic could arrange for rehabilitation and speech therapy.

Several visits followed that were more in the nature of routine pediatric care. Plaintiff made another visit on October 24, 1989, and received booster shots on December 8, 1989. He underwent more tests on March 6, 1990, was examined for an apparent infection at the Pediatric Walk-In Clinic on April 25, 1990, was seen for a cough and a fever at the same pediatric clinic on May 17, 1990, and was rechecked there for an ear infection on May 25, 1990. The mother and plaintiff missed a June 6, 1990 appointment, made a June 19, 1990 visit in connection with strep throat, and on September 19, 1990 went for a checkup, and at that time received a tuberculosis test. Some of these visits were connected with school attendance requirements. Plaintiff contends that certain of these visits were still related to his birth injuries, but, as noted below, that conclusion is belied by the medical record as well as common sense. The fact that a medical record includes a recitation of health factors possibly connected to the birth means only that the record keeping is admirably comprehensive, and not that

the treatment for the birth injury is continuing by virtue of the record keeping.

In any event, these records evince three general groupings of treatment: appointments and treatment at the time of the birth and relating directly to the birth; a subsequent succession of visits, with many appointments not kept by plaintiff and his mother, relating to cerebral palsy; and the latest groupings of visits that are more in the nature of the usual spate of routine pediatric visits. Plaintiff's endeavor is to link these all together into one seamless course of treatment dating back to the birth and consequential adverse health problems and continuing through all subsequent visits that in any manner related to plaintiff's cerebral palsy. In this case, that characterization is critical to the maintenance of the action, insofar as the lapse of significant time periods otherwise renders the action time-barred.

Plaintiff commenced this action for medical malpractice by service of a summons and complaint on defendant-appellant HHC on or about November 20, 1990. The complaint alleged that the injuries occurred "during the pregnancy, labor, delivery and perinatal periods." A notice of claim was filed on October 18, 1990. The filing of the notice of claim was not done under a grant of leave, though, a factor which, as discussed below, is critical in this case. The notice of claim stated that the injuries occurred "during the prenatal period and * * * [during the] labor, delivery and postnatal" periods. Notably, the pleadings and notice of claim did not reference alleged malpractice occurring during courses of treatment subsequent to the birth and its immediate aftermath.

The summons and complaint were served and filed, and the notice of claim was filed, approximately 5½ years after the incidence of malpractice. The malpractice statute of limitations is 2½ years from the act of malpractice or "last treatment where there is continuous treatment for the same * * * condition * * * For the purpose of this section the term 'continuous treatment' shall not include examinations undertaken at the request of the patient for the sole purpose of ascertaining the state of the patient's condition" (CPLR 214-a). However, CPLR 208 provides for a 10-year toll on the statute of limitations for infancy, so that for purposes of the statute of limitations, we need not digress to examine whether treatment was continuous to within 2½ years of the filing of the summons and complaint; the tolling period made the commencement timely as a matter of law for purposes of the statute of limitations.

However, the issue of continuous treatment is critically important, and in fact dispositive, with respect to the limitations period imposed with regard to the filing of the notice of claim, infra. Moreover, the tolling period for the statute of limitations has relevance if, during that time period, leave is requested to file a late notice of claim. However, if leave is not requested during that time period, then the separate limitations period imposed by General Municipal Law § 50-e must be strictly applied.

General Municipal Law § 50-e (1) (a) requires that a notice of claim in a tort action against a public corporation must be served within 90 days after the claim arises. A court in its discretion, and upon application by the plaintiff, may extend the time to do so. General Municipal Law § 50-i (1) imposes a one year and 90 day outside margin, running from the date of the event giving rise to the action. An additional restriction on the court's grant of leave is imposed by General Municipal Law § 50-e (5), in that the extension may not exceed the time limit for the commencement of the action against the public corporation. Logically, for such a leave request made during the tolling period for the statute of limitations, the court's exercise of discretion is circumscribed by the clear legal mandate that if leave is granted, the late filing of the notice of claim still must be accomplished within the statute of limitations period, as extended by the tolling provisions of CPLR 208 (*Cohen v Pearl Riv. Union Free School Dist.*, 51 NY2d 256 [1980]). However, in this case, an application was not even made to file a late notice of claim by the time the statute of limitations had run, if we deem the limitations period to have commenced at the time of the injury, i.e., birth (*see Sarjoo v New York City Health & Hosps. Corp.*, 252 AD2d 449 [1998] [*Sarjoo I*]). If the application for leave is not made prior to the running of the statute of limitations, it may not thereafter be granted (*Matter of Janvier v New York City Health & Hosps. Corp.*, 162 AD2d 342 [1990], *lv denied* 76 NY2d 711 [1990]). In this case, although the notice of claim was filed some 5½ years after birth, the filing was not pursuant to a grant of leave. This was untimely.

However, the continuous treatment doctrine has also been applied to the General Municipal Law § 50-e filing deadline (*Allende v New York City Health & Hosps. Corp.*, 90 NY2d 333, 337-338 [1997]). Hence, if the treatment related to the alleged injury continues beyond the original event that caused the injury, the section 50-e filing requirement is also tolled during

that time period (*Allende, supra*). As a practical matter, this means that as long as the notice of claim is filed within 90 days after the conclusion of that continuing treatment, it is timely, and no request for leave is necessary for the filing to be valid. Hence, in view of the lapses of time in this case, we must preliminarily determine whether there was continuous treatment from the January 1985 birth to a point of time within 90 days of the service of the notice of claim, so that the notice of claim may be deemed to have been timely filed.

This case bears remarkable similarity to the recent decision in *Plummer v New York City Health & Hosps. Corp.* (98 NY2d 263 [2002]). A recitation of *Plummer*'s facts and circumstances has present relevance. In *Plummer*, the child was born in 1985, the notice of claim was filed in 1990, and the action was commenced in 1991. Although the notice of claim was untimely if the section 50-e deadline was applied, it was filed within the CPLR 208 10-year statute of limitations' tolling period for infancy. However, the Court of Appeals found that tolling period unavailing for purposes of the deadline to be imposed for the filing of the notice of claim, insofar as that plaintiff had never sought or acquired leave of court to file late (see discussion in *Plummer v New York City Health & Hosps. Corp.*, 285 AD2d 374, 377 n 2 [2001] [Friedman, J., dissenting]). The only means of making the untimely filing of the notice of claim valid in *Plummer* would have been to demonstrate that the treatment for the claimed injury was continuous to within 90 days of the date when the notice of claim was filed. However, the Court of Appeals found that the treatment, in fact, had been discontinuous, notwithstanding that subsequent treatment had been for maladies seemingly related to occurrences during the infant's birth. Interestingly, in the *Plummer* case, as with the case presently under review, the birth injuries being alleged arose at North Central Bronx Hospital and plaintiff sued HHC and alleged continuous treatment by virtue of postbirth treatment at North Central's Pediatric Rehabilitation Medicine Clinic for his Erb's Palsy and at North Central's Pediatric Clinic for routine health care. The infant plaintiff and his mother had relocated to Florida after the child's birth. The clinic advised the mother to seek medical attention in Florida and indicated that it would forward the medical records upon request. The Court of Appeals noted that both parties in that case understood that North Central's treatment would not continue once plaintiff relocated to Florida. Subsequently, the child was treated again at North Central after moving back to

New York for various routine matters and also for a speech evaluation, though the plaintiff and his mother missed some scheduled appointments. This treatment, though, occurred approximately 16 months after the previous treatment. The Court found that the move to Florida broke the continuity of the treatment, and it rejected as conclusory the mother's assertion that she had intended that the child still be treated at North Central even after they moved to Florida. Moreover, routine treatments unrelated to the injury that gave rise to the action did not extend the treatment for General Municipal Law § 50-e purposes. *Plummer* held that the treatment must be for the injury giving rise to the claim, that the future treatments must be explicitly anticipated by both physician and patient, which must be manifested in the form of a regularly scheduled future appointment, agreed upon during the last visit, in conformance with the periodic appointments that had characterized treatment for that injury in the immediate past, and that the next scheduled appointment must be intended as part of the ongoing corrective action (*id.* at 267-268, citing *Richardson v Orentreich*, 64 NY2d 896, 898-899 [1985]). These factors compel us to conclude that there was no continuous treatment in the present case up to within 90 days of the date when the notice of claim was filed.

The principle has also evolved that even if the hospital expected the patient to return for follow-up treatments, in order for the continuous treatment doctrine to apply, the plaintiff patient also must intend to do so in connection with the injury for which treatment was being sought (*Allende, supra*). The physician and patient must reasonably intend "the patient's uninterrupted reliance upon the physician's observation, directions, concern, and responsibility for overseeing the patient's progress" (*Richardson, supra* at 899). The continuing treatment must be pursuant to the course of treatment established with respect to the condition that gave rise to the lawsuit (*Plummer, supra*; *Nykorchuck v Henriques*, 78 NY2d 255, 258-259 [1991]). A mere continuing diagnosis by the same physician or hospital is insufficient to establish the doctrine (*Ganess v City of New York*, 85 NY2d 733, 736 [1995]; *McDermott v Torre*, 56 NY2d 399, 406 [1982]).

These factors do not allow for continuation of treatment within 90 days of the filing of the notice of claim under the facts of the present case. The malpractice alleged arises in connection with birth defects, and not in connection with the adequacy of later treatment for cerebral palsy or the routine types

of pediatric treatment that plaintiff later received. There is no issue that plaintiff was misdiagnosed during the course of this later treatment which, if a misdiagnosis had occurred, could have constituted continuous treatment as to that misdiagnosis (*cf. Hein v Cornwall Hosp.*, 302 AD2d 170 [2003]). The only relevance that the treatment for cerebral palsy has for our present review is the question whether that treatment, not negligent in and of itself, manifested a continuation of the treatment from the time of the alleged malpractice at birth. There is no credible indication in the record that from 1985 until, at the earliest, August 1987, the parties expected any continuity of treatment for injuries arising in connection with plaintiff's birth. Notwithstanding the mother's conclusory statements that she periodically returned to the United States, the fact is that she relocated back to Guyana with plaintiff and pursued medical treatment, even if it was inadequate medical treatment, in that country. Her conclusory allegations that she generally expected North Central Bronx Hospital—a half a world away—to remain the treating medical entity, does not satisfy the clear requirement that both parties must actively manifest such an intent (*Plummer, supra*).

Even discharge records indicate that the mother was referred to another medical entity—not North Central Bronx—for follow-up treatment, and even then she missed appointments. A succession of missed appointments, in any event, may also serve to sever the continuity of treatment (*Bellmund v Beth Israel Hosp.*, 131 AD2d 796 [1987]; *Barrella v Richmond Mem. Hosp.*, 88 AD2d 379 [1982]). Hence, even if these facts allowed for a continuation of treatment beyond August 1987, the mother's failure to continue with scheduled appointments, coupled with her continual relocation outside the country, notwithstanding additional conclusory assertions that she expected treatment by North Central Bronx to continue, also interrupted treatment. Several of these visits were merely diagnostic rather than constituting ongoing treatment. Finally, as noted, the visits to the clinic in 1989 and 1990 seem prompted by routine pediatric care rather than being related to the birth defects, and so that would clearly constitute different, rather than continuing, treatment. Hence, insofar as treatment did not continue to within 90 days of the service of the notice of claim, and no timely request for leave to file a late notice of claim was made, the claim is barred.

Accordingly, the order of the Supreme Court, Bronx County (Stanley Green, J.), entered April 10, 2001, which denied

defendant's motion to dismiss the complaint for failure to comply with the notice of claim provisions of General Municipal Law § 50-e (1) (a), should be reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment in favor of defendant-appellant dismissing the complaint as against it.

LERNER, J. (dissenting). I agree with the majority that fundamental to the continuous treatment doctrine is a course of treatment established with respect to the medical condition that gave rise to the underlying medical malpractice claim. I respectfully disagree with the majority's determination that, as a matter of law, plaintiff's visits prior to the filing of the notice of claim were of a routine nature and not related to plaintiff's medical condition at issue. I submit that a review of the medical records proffered on this appeal, particularly those regarding plaintiff's visits on October 24, 1989, December 8, 1989 and September 19, 1990, are sufficient to raise factual issues as to whether these visits dealt with plaintiff's alleged birth-related injuries, thus precluding summary relief. Specific references to the slow, involuntary movement of plaintiff's left extremities, his need for speech, hearing and occupational therapies and his cerebral palsy demonstrate issues, at the very least, as to whether New York City Health and Hospitals Corporation (HHC) was continually monitoring and assessing the nature, extent and progression of the very injuries at issue during these "routine" visits. Accordingly, I would affirm the IAS court's denial of HHC's motion for summary judgment.

NARDELLI, J.P., and WILLIAMS, J., concur with TOM, J.; LERNER, J., dissents in a separate opinion.

Order, Supreme Court, Bronx County, entered April 10, 2001, reversed, on the law, without costs, and defendant's motion to dismiss the complaint granted. The Clerk is directed to enter judgment in favor of defendant-appellant dismissing the complaint as against it.