■ JOHNSON DEVADAS et al., Respondents, v KEVIN NIKSARLI, M.D., et al., Appellants. [992 NYS2d 197]—

Judgment, Supreme Court, New York County (Doris Ling-Cohan, J.), entered August 12, 2011, upon a jury verdict in favor of plaintiffs, modified, on the law, to the extent of dismissing the derivative claim of plaintiff Saramma Devadas, and otherwise affirmed, without costs.

In March 2004, plaintiff Johnson Devadas (plaintiff), a 25-year-old pharmacist, accompanied his wife when she went to consult defendant Kevin Niksarli (defendant), an ophthalmologist specializing in Lasik surgery.[1] A Lasik surgeon attempts to improve vision by cutting a flap in the eye with a laser and reshaping the cornea to allow light to fall on the retina, instead of in front of or behind it. Plaintiff had not himself been considering Lasik, but he was nearsighted and found that wearing glasses and having to focus on a computer screen at his pharmacy gave him headaches. He decided to be evaluated by defendant that day, too. Defendant told plaintiff he was a suitable candidate for the procedure, after plaintiff was put through various tests. These included a topography, which plotted the shape of his cornea, and a pachymetry exam, which measured the thickness of his cornea. Defendant also performed an autorefraction and a slit lamp test.

Plaintiff decided to go through with the procedure and scheduled it for April 6, 2004. That day, he was given a Valium

---

1. Newsight Laser Center, PLLC, the entity that owns the center where Niksarli operates, is also a defendant, and the term defendant herein, although primarily referring to Niksarli, encompasses the entity as well.

tablet because he was nervous, and was then given a written consent form, which he signed. The form listed a variety of possible complications, including evening glare, less-than-corrected 20/20 vision, haloed vision, double vision, progressive corneal thinning (also known as ectasia), and complications that might require further procedures, including a corneal transplant.

Plaintiff returned to defendant's office the day after the procedure, as instructed. He told defendant that his left eye was blurry and tearing, and that he felt like he had grains of sand inside his eye. The doctor told him that this was a normal and temporary condition which would subside. At his next follow-up visit on April 19, 2004, plaintiff again complained of the blurry vision in his left eye, and told defendant that, while the tearing had stopped, he was now experiencing dryness in that eye. According to plaintiff, defendant was dismissive, and recommended rewetting drops. At his six-week postoperative appointment, on May 19, 2004, plaintiff made the same complaints but recalled that defendant was again dismissive, telling plaintiff that he was expecting too much so soon after the surgery, and that he needed to give his eyes time to heal. Defendant told plaintiff to follow up "as needed," and that he could come back any time. According to plaintiff, although "[t]here was no definite time [he] had to come back to him," he considered Dr. Niksarli his "ophthalmologist for life." This was based on plaintiff's recollection that defendant had assured him that the procedure came with a lifetime guarantee.

Plaintiff had no further contact with defendant until February 21, 2007. Although the postsurgical blurriness had never really gone away, plaintiff stated that he learned to adapt to it. By early 2007, however, the blurriness had gotten worse, and plaintiff began experiencing visual distortions and double vision. At the February appointment, defendant performed tests similar to those he had performed preoperatively, and diagnosed plaintiff with a condition called forme fruste keratoconus (FFK). Keratoconus is a bilateral bulging of the cornea and the forme fruste type is an early presentation of the condition. Defendant told plaintiff that it was a genetic condition where the collagen inside the cornea progressively weakens, with no known cure except an experimental procedure being performed by a doctor in California. Defendant told plaintiff that the Lasik surgery had nothing to do with the onset of plaintiff's condition.

Plaintiff commenced this action on May 31, 2007, alleging that defendant committed medical malpractice. His wife interposed a derivative claim. Defendant moved for summary judgment, arguing that plaintiff filed his summons after the

expiration of the 2½-year statute of limitations for medical malpractice actions (CPLR 214-a). He argued that the cause of action accrued on April 6, 2004, when he performed the Lasik procedure. Plaintiff, in opposing the motion, invoked the continuous treatment doctrine, contending that defendant had continued treating him for a blurry vision condition, with no interruption, after the surgery was performed, and up to and including his last visit to defendant on February 21, 2007. Plaintiff's expert opined that the blurry vision for which plaintiff visited defendant in February 2007 was related to the Lasik surgery, because the Lasik caused the dormant condition of FFK to manifest into a more active keratoconus, which severely affected plaintiff's vision. Defendant countered by asserting that the last possible date he could be considered to have treated plaintiff was May 19, 2004, at the six-week postoperative checkup, which would render the action time-barred. He argued that plaintiff made no complaints at the time, and had corrected vision of 20/20. He further stated that, although instructed to schedule a routine ophthalmology exam with defendant, three to six months in the future, plaintiff never did so. Finally, defendant argued that the blurriness which prompted plaintiff to visit him in February 2007 was unrelated to the blurriness the Lasik surgery was designed to address.

The court denied the summary judgment motion, finding that issues of fact precluded it from determining the continuous treatment question. The case proceeded to trial. Dr. Paul B. Donzis, plaintiff's expert ophthalmologist, reiterated his opinion, laid out in opposition to the summary judgment motion, that plaintiff had mild dormant FFK before surgery, and that the Lasik surgery weakened plaintiff's cornea such that it triggered the dormant FFK to become active. Thus, he stated, while the surgery was technically performed well, it should have never been performed in the first place. Dr. Donzis testified that dormant FFK can become triggered anywhere from a month or two to five years after Lasik surgery. He further testified that plaintiff's blurry vision immediately after the surgery could not have been from FFK; rather, it was normal temporary Lasik postsurgical blurriness. He stated that plaintiff did not begin experiencing FFK-related blurriness until a few months before the February 2007 visit with defendant.

Defendant's main expert, an ophthalmologist named Dr. Peter Hersh, opined that, upon reviewing the 2004 data, the topography of plaintiff's eyes did not indicate that he had FFK prior to the Lasik procedure. Therefore, he stated, defendant's assessment of plaintiff's condition was appropriate, and Lasik surgery

was not contraindicated. Dr. Hersh further testified that a patient can develop FFK absent a Lasik procedure, and there was no causal connection between plaintiff's Lasik surgery and his subsequent development of FFK.

The jury returned a verdict for plaintiff, specifically finding that the last date of continuous treatment was February 21, 2007. It awarded plaintiff $100,000 for past pain and suffering, $3,000,000 for future pain and suffering over 45 years, $60,000 in lost earnings, and $740,000 for future lost earnings for a period of 37 years ($20,000 per year). The jury awarded plaintiff's wife $20,000 for past loss of services and $100,000 for future loss of services. Defendant moved for, among other things, judgment notwithstanding the verdict, or, in the alternative, for an order setting aside the verdict and directing a new trial on the grounds that the verdict was against the weight of the evidence and that the court had committed prejudicial errors, or, in the alternative, for an order reducing the damages. The court denied defendant's motion. Regarding defendant's argument that the claim was barred by the statute of limitations, the court stated that the "issue of whether [plaintiff's] February 21, 2007 visit to [defendant] constituted continuous treatment was determined to be a question for the jury, in defendants' previous summary judgment motion" (2010 NY Slip Op 33942[U], *13 [Sup Ct, NY County 2010]).

As a preliminary matter, we note that defendant's statute of limitations defense must be analyzed in light of the fact that the question of the applicability of the continuous treatment doctrine was put before, and decided by, a jury. Accordingly, the jury's verdict on that issue should only be set aside as not supported by sufficient evidence if "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial" (Cohen v Hallmark Cards, 45 NY2d 493, 499 [1978]). Accordingly, we review the issue with great deference to the jury.

The continuous treatment doctrine is codified at CPLR 214-a, which provides, in pertinent part, that "[a]n action for medical, dental or podiatric malpractice must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure." One of the purposes of the doctrine is to permit a doctor to address a possible act of malpractice without the distraction of a lawsuit commenced by the very person he or she is trying to treat (Nykorchuck v Henriques, 78 NY2d 255, 258 [1991]).

Defendant claims that the continuous treatment doctrine did not toll the statute of limitations because plaintiff's treatment with defendant concerning the Lasik surgery came to an end, at the latest, on May 19, 2004, and plaintiff's next visit, nearly three years later, was for an unrelated condition. Specifically, he argues that the reason for the surgery was garden-variety myopia, and the visits after the surgery, up to and including the May 2004 visit, were for routine follow-up exams that every Lasik patient has. Further, defendant asserts that the February 2007 visit arose not out of the myopia condition, but rather out of the keratoconus that plaintiff alleges was brought on by the surgery. Thus, he contends that the conditions were not the "same" for purposes of CPLR 214-a. Defendant further notes that, after the May 2004 visit, plaintiff never scheduled another follow-up appointment and never even communicated with defendant, until he reappeared in 2007. Thus, he concludes, the original treatment had come to an end.

Plaintiff, on the other hand, asserts that the 2007 visit satisfied CPLR 214-a, because it was for the "same" condition as the 2004 visits, which was blurry vision in his left eye. He further argues that whether he and defendant agreed that he would seek further treatment after the May 2004 visit is irrelevant, because defendant "guaranteed" that the Lasik procedure would correct the blurry condition, and stated that he was plaintiff's "doctor for life" for that purpose.

Although the CPLR defines "continuous" treatment as treatment *"for* the *same* illness, injury or condition" out of which the malpractice arose (CPLR 214-a [emphasis added]), the controlling case law holds only that the subsequent medical visits must "relate" to the original condition (*Richardson v Orentreich*, 64 NY2d 896, 899 [1985]; *Chestnut v Bobb-McKoy*, 94 AD3d 659, 660 [1st Dept 2012]). Here, plaintiff initially engaged defendant to correct his blurry vision, and the 2007 visit was motivated by continued blurriness in plaintiff's eye, thus making the two visits "related" (*id.*).

Indeed, this view of the evidence has support in the case law. For example, in *Branigan v DeBrovner* (197 AD2d 270 [1st Dept 1994]), the defendant gynecologist failed to diagnose rubella in the plaintiff, his pregnant patient. He argued that the plaintiff's cause of action for malpractice accrued, at the latest, when he read the results of a rubella test that he had ordered and declared her to not have contracted the disease, a date which predated the commencement of the action by more than $2^{1/2}$ years (*id.* at 271-272). This Court disagreed, and held that the continuous treatment doctrine tolled the start of the limitations

period until the plaintiff's final prenatal visit, stating as follows: "Here, it is undisputed that Dr. DeBrovner was plaintiff's gynecologist and had been providing her with prenatal care during her early pregnancy. While Dr. DeBrovner would limit the condition being treated to rubella and the course of treatment to his May 15, 1989 negative diagnosis, it is clear that plaintiff was under his care for all her early pregnancy prenatal medical needs, and not for a series of unrelated and discrete tests and procedures, each giving rise to a separate and unrelated course of treatment. Plaintiff engaged Dr. DeBrovner's services for her pregnancy and not her complaint of rubella. As her gynecologist/obstetrician, he was required to treat the complications of her pregnancy or, if the complication was beyond his area of specialty, to refer her to another competent medical care provider. Continuous treatment for prenatal care should extend to the time of birth and encompass the myriad, diverse procedures and tests appropriate to carrying a child to term and the delivery" (*id*. at 274). In so holding, we cited favorably to a Third Department decision, *Miller v Rivard* (180 AD2d 331 [3d Dept 1992]). That case involved a woman's "wrongful conception" claim arising out of an unsuccessful vasectomy performed on her husband (*id*. at 333-334). The defendant doctor moved for summary judgment based on the statute of limitations (*id*. at 334). Although it was dicta because the court deemed the defendant to have conceded the point, the court stated the following: "[T]he course of related, continuous treatment in the case of a vasectomy performed for the purpose of birth control does not end until completion of the postoperative procedures of fertility testing and notification to the patient that the test results show that the vasectomy was a success" (*id*. at 338).

Here, plaintiff testified, and the jury was entitled to believe, that, prior to the Lasik surgery, defendant guaranteed him a good result, meaning that the procedure would fix plaintiff's nearsightedness. Under these circumstances, we find that, like the plaintiff in *Branigan*, who was considered to be under the continuous care of her doctor until she carried her baby to term, and the plaintiff in *Miller*, whose husband was considered to be under the continuous care of his doctor until it was determined that he was sterile, plaintiff was under the continuous care of defendant for statute of limitations purposes until defendant rectified plaintiff's vision problems, or, as turned out to be the case, determined that any further efforts by him to do so would be futile.

We must also address defendant's argument that because plaintiff pursued no treatment for over 30 months after May

2004, he is not entitled to a tolling based on his single visit in February 2007. This, again, ignores plaintiff's belief that he was under the active treatment of defendant at all times, so long as the Lasik surgery did not result in an appreciable improvement in his vision. In determining whether continuous treatment exists, the focus is on whether the patient believed that further treatment was necessary, and whether he sought such treatment (*see Rizk v Cohen*, 73 NY2d 98, 104 [1989]). Further, this Court has suggested that a key to a finding of continuous treatment is whether there is "an ongoing relationship of trust and confidence between" the patient and physician (*Ramirez v Friedman*, 287 AD2d 376, 377 [1st Dept 2001]). Plaintiff's testimony that he considered defendant to be his "[doctor] for life," and that the efficacy of the Lasik was guaranteed, was a sufficient basis for the jury to conclude that such a relationship existed.

*Edmonds v Getchonis* (150 AD2d 879 [3d Dept 1989]), a dental malpractice case, illustrates this point. There, the defendant inserted an implant in the plaintiff's mouth in November 1977 to correct a "denture problem" (*id.* at 879-880). After the removable implant was determined to be ineffective, the defendant inserted a fixed one in August 1978 (*id.* at 880). He then told the plaintiff that he no longer needed to see her, unless she had any problems (*id.*). In fact, the plaintiff wrote a letter to the defendant in September 1978 thanking the defendant for his efforts and noting "we have finally come to a parting of our ways" (*id.*). In December 1980, 27 months later, the plaintiff went to see the defendant, complaining of "continued denture-related problems," and continued under his care through August 1982 (*id.*). The defendant moved for summary judgment dismissing part of the action, which was commenced in September 1983, arguing that any claim for malpractice that took place more than three years prior (the statute of limitations was three years at the time) was time-barred (*id.*). The plaintiff contended that her visit in December 1980 related back to the insertion of the original implant, and the court found that there was at least an issue of fact, stating as follows: "Assessed from plaintiff's point of view, the temporal gap between visits was not excessive. In her opposing affidavit, plaintiff averred that she continued to place her trust and confidence in [the defendant's] care, that she did not consult any other dentist, that her September 10, 1978 letter was not intended to terminate her relationship with [the defendant] and that she finally returned for treatment when 'the problem with my implant get [sic] progressively worse.' Given the history of dental treatment in this case, we find, at the very least, that a question of fact exists as to whether plaintiff's December 1980

return was 'timely' for purposes of establishing the required continuity" (*id.* at 881).

Plaintiff's vision problems here are analogous to the plaintiff's "denture problem" in *Edmonds,* and the jury did not act irrationally in finding that plaintiff continued to place trust and confidence in defendant's ability to correct his blurry vision. Further, even if we were to accept the proposition advanced by defendant, that the keratoconus was unrelated to the Lasik surgery, plaintiff had no reason to believe that to be the case when he returned to defendant in February 2007. Thus, in reasonably believing that his continued, and worsening, blurry vision was attributable to the Lasik surgery that defendant had guaranteed, plaintiff was genuinely "confronted with the dilemma that led to the judicial adoption of the continuous treatment doctrine" (*Rizk v Cohen,* 73 NY2d at 104).

Cases such as *Clayton v Memorial Hosp. for Cancer & Allied Diseases* (58 AD3d 548 [1st Dept 2009]) are inapplicable here, to the extent they reiterate that "continuous treatment exists 'when further treatment is explicitly anticipated by both physician and patient as manifested in the form of a regularly scheduled appointment for the near future, agreed upon during that last visit, in conformance with the periodic appointments which characterized the treatment in the immediate past' " (58 AD3d at 549, quoting *Richardson v Orentreich,* 64 NY2d at 898-899).

In *Clayton,* the plaintiff asserted that a visit to the defendant in January 2001 was in continuance of treatment last rendered in November 1999 (58 AD3d at 549). This Court found that the continuous treatment doctrine did not apply, because the plaintiff testified that she did not believe anything further could be done to treat her condition after the November 1999 visit, and there was no evidence that plaintiff viewed the two visits as related (*id.*).

Here, of course, plaintiff went back to defendant in February 2007 precisely because he wanted defendant to fulfill his guarantee that the Lasik surgery would work. This was consistent with the notion that "[i]ncluded within the scope of 'continuous treatment' is a timely return visit *instigated by the patient* to complain about and seek treatment for a matter related to the initial treatment" (*McDermott v Torre,* 56 NY2d 399, 406 [1982] [emphasis added]). Indeed, "as a practical matter, it is not always possible to know at the conclusion of one visit with a physician whether a further visit with the physician may become indicated for the same condition within a reasonable time thereafter" (*Gomez v Katz,* 61 AD3d 108, 114 [2d

Dept 2009]). We further note that defendant prescribed Timoptoc to plaintiff at the February 21, 2007 appointment, to alleviate the effects of keratoconus. The term "course of treatment" includes the prescription of medications (*see id.* at 112).

It bears emphasizing that the question of the applicability of the continuous treatment doctrine was specifically put before the jury. Our view of the trial record is that sufficient evidence was put before the jury to justify its determination that plaintiff's visit to defendant in February 2007 tolled the statute of limitations. Accordingly, we defer to the jury and uphold that portion of its verdict.

Notwithstanding that determination, the derivative claim of Saramma Devadas must nevertheless be dismissed. "[T]olling of the statute of limitations pursuant to the continuous treatment doctrine is personal to the recipient of such treatment and does not extend to a derivative claim for loss of services" (*Wojnarowski v Cherry*, 184 AD2d 353, 354-355 [1st Dept 1992]). Accordingly, plaintiff Saramma Devadas's claim is time-barred.

As for the jury's substantive determination that defendant committed malpractice, we cannot say that "no valid line of reasoning and permissible inferences . . . could possibly lead rational [people] to th[at] conclusion . . . on the basis of the evidence presented at trial" (*Cohen*, 45 NY2d at 499). Quite simply, plaintiffs expert ophthalmologist, Dr. Donzis, testified that it was his opinion, within a reasonable degree of medical certainty, that plaintiff had a mild dormant form of FFK contraindicating Lasik surgery, and that defendant should have diagnosed this condition. Further, he testified that the Lasik surgery caused plaintiff's dormant FFK to become active, resulting in his vision problems. While defendant's experts may have disagreed, that is not a reason to set aside the verdict (*see Brotman v Biegeleisen*, 192 AD2d 410, 410 [1st Dept 1993], *lv denied* 82 NY2d 654 [1993]).

Defendant mischaracterizes Dr. Donzis's testimony in an effort to discredit it. For example, he points to passages which suggest that even Dr. Donzis conceded that FFK could not be diagnosed in 2004, when defendant performed the Lasik surgery. However, while the experts agreed that plaintiff's dormant FFK could not be diagnosed clinically using a slit lamp, they agreed that dormant FFK could be diagnosed via topographic map. Thus, if the jury believed that plaintiff had dormant FFK in 2004, it had a basis for finding that defendant could and should have diagnosed it. Defendant also points to the fact that Dr. Donzis agreed that plaintiff's age and cornea thickness were within normal limits, and that the Humphrey-Pathfinder analy-

sis stated that plaintiff's eye topography was normal. However, Dr. Donzis also testified that defendant should not have relied solely upon the Humphrey-Pathfinder analysis, given that plaintiff's corneal thickness and topography were borderline normal, and plaintiff was young, an additional risk factor. According to Dr. Donzis, defendant should have performed an independent analysis of plaintiff's I-S value,[2] which would have indicated that plaintiff's I-S was 3.08, a level at which Lasik was contraindicated. Further, defendant's protestations regarding Dr. Donzis's use of the 2006 version of Pathfinder is a red herring. Dr. Donzis testified that the 2006 version presented the topography of plaintiff's eye in a different manner than the 2004 version of the software. Critically, however, he added the caveat that the "absolute numbers" used to determine whether there is an abnormality are the same, regardless of the software used. Thus, the jury had reason to disregard the fact that Dr. Donzis used a version of the software that was unavailable to defendant during his initial examination of plaintiff.

Defendant also mischaracterizes the record by arguing that Dr. Donzis "manipulat[ed] numerical descriptions" in determining that plaintiff's I-S was 3.08. Defendant's expert, Dr. Hersh, testified that Dr. Donzis's numbers were incorrect, not because he "manipulated" data, but because he incorrectly used all corneal measurements within a 3 mm radius of the eye's center. By doing so, Dr. Hersh opined, Dr. Donzis relied on data that was inaccurate due to interference caused by plaintiff's long lashes. Instead, according to Dr. Hersh, the I-S should be calculated by using only the data within a 2 mm radius, or 4 mm zone. On cross-examination, however, plaintiff's counsel read Dr. Hersh's testimony from a prior trial of an unrelated case, in which he stated that it was really the data from the central 6 mm of the cornea that should be used. This contradicted his direct testimony. Dr. Hersh could not explain the discrepancy between his testimony in this trial and the other, nor could he point to any support for his use of a 4 mm methodology at the trial of this matter. Under such circumstances, it would have been reasonable for the jury to discredit Dr. Hersh, and believe Dr. Donzis.

Defendant also points to the testimony of Dr. Chu, who conducted a medical examination for him in which he found plaintiff's vision to be 20/30 uncorrected, and 20/20 when corrected. However, Dr. Chu admitted that he did not conduct any

---

**2.** I-S value is short for Inferior-Superior value, a measurement that represents a comparison between the shape of the top half of the cornea and the lower half. A higher number indicates a more irregularly shaped eye.

qualitative testing to address plaintiff's claims of cometing, haloing, and other adverse effects of the Lasik surgery. Further, while Dr. Chu explained that plaintiff's near 20/20 vision belied any such claims, making further objective testing unnecessary, the jury was not obliged to believe this explanation.

We reject defendant's argument that the jury's verdict was tainted by the introduction of a topography of plaintiff's eye created with software not available until two years after the surgery in question. Again, the critical aspect of Dr. Donzis's testimony was that plaintiff's I-S was 3.08, and this was obtained without use of the 2006 topography. Nor was defendant prejudiced by plaintiff's failure to produce the topography during discovery. Plaintiff's expert disclosure provided that his expert would testify as to all records, including "post-operative topographies." Since defendant had the 2006 Pathfinder software, and the 2004 data, he could have easily created the topography himself.

We further find that the jury award did not deviate materially from what would be reasonable compensation (CPLR 5501 [c]). Plaintiff sustained serious and permanent damage to his vision, testifying that he continues to suffer from double vision, starbursts, and halos. His eyes are constantly dry, and even though he has an unrestricted drivers license, he testified that he can only wear corrective lenses for about six hours a day. Even surveillance tape shown at trial by defendant establishes that plaintiff must depend on his wife and father for rides to work and other places. Case law supports significant awards for blindness in one eye (*see e.g. Sanchez v Project Adventure, Inc.,* 12 AD3d 208 [1st Dept 2004]; *Crawford v Williams*, 198 AD2d 48 [1st Dept 1993], *lv denied* 83 NY2d 751 [1994]), and because plaintiff's condition affects both eyes, the jury had sufficient basis to award plaintiff the amount it did.

Finally, the judgment complies with CPLR 5031. Concur— Mazzarelli, J.P., Renwick, DeGrasse and Gische, JJ.

Friedman, J., dissents in part in a memorandum as follows: The majority affirms the judgment for plaintiff Johnson Devadas in this medical malpractice action based on its holding that a factual question was presented at trial as to whether the "continuous treatment" doctrine tolled the running of the statute of limitations from May 19, 2004, the date of plaintiff's last immediate postoperative consultation with defendant Kevin Niksarli, M.D., until February 21, 2007, the date of plaintiff's last consultation with defendant before he commenced this ac-

tion.[1] The majority reaches this result even though it is undisputed that, following defendant's performance of the allegedly contraindicated LASIK eye surgery in April 2004, there was no contact of any kind between plaintiff and defendant during the 33 months that passed between the May 2004 visit and the February 2007 visit—an interval three months longer than the 30-month limitation period (CPLR 214-a). The majority's sustaining of a finding that a course of "continuous treatment" persisted over a period longer than the limitation period, in which no physician-patient contact whatsoever occurred, appears to be without precedent in this state (see Edward J. Guardaro, Jr. & Norman Bard, New York Medical Malpractice § 9:100 [2014]).

The majority purports to justify its apparently unprecedented holding by pointing to the "guarantee" that plaintiff claims to have received from defendant. According to plaintiff's own testimony, however, this alleged "guarantee" was nothing more than a promise that plaintiff would not be charged for additional treatment or follow-up procedures relating to the LASIK surgery.[2] By plaintiff's own account, although he believed that he could see defendant "at any time" for issues relating to the surgery, on an "as-needed basis," he had no specific intention of returning to consult with defendant at any "definite time," or within any particular time frame, after the May 2004 office visit. Notwithstanding the blurred vision that persisted after the operation, plaintiff testified that he did not return to defendant's office for nearly three years after the May 2004 appointment because he "had adapted to [the] blurry vision" and had found defendant to be "dismissive" of his complaints at his postoperative visits in 2004. It was only when the blurred vision "got[ ] worse" in early 2007 that plaintiff returned to see defendant.

Even assuming in plaintiff's favor that his May 2004 and February 2007 consultations with defendant were "for the same illness, injury or condition" (CPLR 214-a), I cannot see how plaintiff's knowledge of the alleged "guarantee," by itself, can be deemed to support a finding that "continuous treatment"

---

**1.** I concur with the majority's dismissal of the derivative claim of plaintiff Saramma Devadas. In the remainder of this writing, the term "plaintiff" refers to plaintiff Johnson Devadas. References to "defendant" include Dr. Niksarli's professional limited liability company, which is also named as a defendant in this action.

**2.** According to defendant, he had told plaintiff that he could receive any follow-up treatment free of charge for the first year after the surgery and, thereafter, he would be billed for further treatment relating to LASIK surgery at a reduced rate.

persisted over a 33-month period in which there was neither any actual physician-patient contact nor any definite plans or expectation for such contact to resume. That plaintiff believed he could return to defendant's office at any point in the future to seek treatment relating to his LASIK surgery, on an "as-needed basis," does not distinguish this case from any situation in which a course of treatment concludes without either a definite breach in the physician-patient relationship or the patient's switching to a different doctor. Plaintiff's belief that defendant would not charge him for any future LASIK-related treatment is irrelevant to the question of whether a course of treatment continued over nearly three years during which the parties had no actual contact, whether in person or otherwise. Thus, plaintiff's own testimony establishes, as a matter of law, that defendant's continuous treatment of plaintiff relating to the allegedly negligent April 2004 LASIK surgery came to an end in May 2004. Plaintiff's brief resumption of treatment with defendant in February 2007 (for only one visit), while perhaps for the same condition, was not part of the earlier course of treatment that had ended in May 2004 and could not revive claims arising from that course of treatment, for which the statute of limitations had expired in November 2006. A renewal or resumption of treatment after a lengthy break is not continuous with an earlier course of treatment that had reached its end (*see Rizk v Cohen*, 73 NY2d 98, 105 [1989] [the continuous treatment doctrine did not apply where the later contact between the parties "was a renewal, rather than a continuation, of the physician-patient relationship"]; *Aulita v Chang*, 44 AD3d 1206, 1210 [3d Dept 2007] [the patient's "later treatment . . . could only be considered a resumption of treatment as opposed to a continuation of his prior care" (internal quotation marks omitted)]; *Van Inwegen v Lucia*, 222 AD2d 576, 577 [2d Dept 1995] ["the plaintiff's return to Dr. Lucia in August of 1982 for treatment of two teeth which he had not worked on since 1977 was a resumption of treatment rather than continuous treatment"]).

The purpose of the continuous treatment toll, now codified by CPLR 214-a, is "to enforce the view that a patient should not be required to interrupt corrective medical treatment by a physician and undermine the continuing trust in the physician-patient relationship in order to ensure the timeliness of a medical malpractice action" (*Young v New York City Health & Hosps. Corp.*, 91 NY2d 291, 296 [1998]). Here, during the 33-month interval between plaintiff's May 2004 and February 2007 consultations with defendant, plaintiff was not undergoing any treatment of any kind by defendant; hence, commencing an action within that period would not have interrupted any ongoing

treatment. While it is possible for a course of continuous treatment to be extended beyond the patient's last visit with the physician "when further treatment is explicitly anticipated by both physician and patient as manifested in the form of a regularly scheduled appointment for the near future" (*Richardson v Orentreich*, 64 NY2d 896, 898-899 [1985] [continuous treatment ended on the date of the patient's last scheduled appointment, for which she failed to appear]), in this case—by plaintiff's own admission—the parties did not "explicitly anticipate[ ]" further treatment at any particular time or within any defined time frame. As plaintiff testified at trial: "There was no definite time I had to come back to him. It was an as-needed basis. He was my ophthalmologist for life. According to his guarantee I could come back any time." Again, apart from plaintiff's alleged understanding that any future LASIK-related treatment would be free of charge, this is no different from the conclusion of any course of treatment in which neither the physician nor the patient affirmatively breaks off the relationship. Moreover, plaintiff admits that, in the time between his May 2004 and February 2007 consultations with defendant, he was not aware of any need for further treatment. "Given plaintiff's lack of awareness of a condition warranting further treatment, the purpose of the continuous treatment doctrine would not be served by its application here" (*Young*, 91 NY2d at 297; *see also id.* at 296 ["a patient who is not aware of the need for further treatment of a condition is not faced with the dilemma that the doctrine is designed to prevent"]; *Rizk v Cohen*, 73 NY2d at 104 [there was "no sound basis for applying the continuous treatment doctrine" where the plaintiff was "unaware of the need for further treatment"]).

Further, by extending the course of treatment in which the alleged malpractice occurred from May 2004, when the last regular postoperative examination occurred, to a single visit in February 2007, covering a period of 33 months in which the parties had no contact at all, the majority in effect applies an accrual-upon-discovery rule to a malpractice claim that is not based on the presence of a foreign object in the patient's body.[3] In so doing, the majority contravenes both the Legislature's determination to limit the discovery rule to foreign-object claims (*see* CPLR 214-a) and the Court of Appeals' admonition against

---

3. In the February 2007 examination, defendant diagnosed plaintiff as having a congenital eye condition that, had it been diagnosed in 2004, would have contraindicated LASIK surgery. The majority's ruling effectively tolls the running of the statute of limitations on plaintiff's claim until his discovery, in 2007, of defendant's failure to diagnose the condition in 2004.

judicial extension of the discovery rule beyond the scope the Legislature prescribed for it in the statute (*see Rizk v Cohen*, 73 NY2d at 104 n 3).

The Court of Appeals' statement, quoted by the majority, that a course of continuous treatment includes "a timely return visit instigated by the patient to complain about and seek treatment for a matter related to the initial treatment" (*McDermott v Torre*, 56 NY2d 399, 406 [1982]), does not support the majority's result. As the Court of Appeals noted in *Curcio v Ippolito* (63 NY2d 967 [1984]), a unanimous decision rendered only two years later, the key word in the quoted passage from *McDermott* is "timely." In *Curcio*, the Court of Appeals affirmed summary judgment dismissing as time-barred a malpractice claim against a surgeon who had operated on the plaintiff's nose. The *Curcio* plaintiff, who had been discharged from the defendant surgeon's care in January 1976, went back to see the defendant on February 24, 1979, presenting with complaints about her breathing and nasal indentation, "without having seen defendant or any other physician in the meantime with respect to her nose" (*id.* at 968). In affirming the dismissal of the claim, the Court of Appeals explained: "[I]t is enough to bar plaintiff's claim that no contact between plaintiff and defendant after her discharge and before the February 24, 1979 visit has been shown. Under such circumstances the required continuity has not been established through 'a *timely* return visit instigated by the patient to complain about and seek treatment for a matter related to the initial treatment' (*McDermott v Torre*, 56 NY2d 399, 406 [emphasis supplied]), or otherwise" (63 NY2d at 969). Since, by the majority's reckoning, a return visit may serve to extend the toll of the statute of limitations even where further treatment is not specifically contemplated, a return visit occurring any length of time after the initial course of treatment—perhaps for the rest of the patient's life or for the rest of the physician's career— could be deemed "timely" under the majority's holding. I do not believe that this approach is consistent with the continuous treatment doctrine as formulated by the Court of Appeals and enacted by the Legislature.

The instant plaintiff, like the plaintiff in *Curcio*, had no contact with the defendant physician after the alleged malpractice for a period of time longer than the limitation period applicable to his claim. During that hiatus, moreover, neither party anticipated that contact would be resumed within any particular time frame. Accordingly, the claim here, like the claim in *Curcio*, should be dismissed as time-barred (*see also Spear v Rish*, 161 AD2d 197, 198 [1st Dept 1990] [the plaintiff, who

completed the course of allegedly negligent treatment in 1967 and did not see the defendant physician again until 1975, failed to establish "a 'timely' return visit so as to be able to invoke the continuous treatment doctrine," where, "(d)uring the long periods between treatments, (she) was not under any form of medical care, nor was there any existing ongoing physician-patient relationship"]).

I note that the result reached by the majority is anomalous and will create perverse incentives for physicians. Had plaintiff instituted this suit in February 2007, without visiting defendant's office again for the first time in nearly three years, the action plainly would have been dismissed pursuant to the statute of limitations upon defendant's motion. By deeming plaintiff's one-time office visit in February 2007 to extend a course of treatment that otherwise plainly ended in May 2004, the majority sends physicians the unfortunate message that they should think twice before seeing patients with whom they have not had contact for longer than 2½ years—especially in the cases of patients with whom the physicians have had difficulties. Under the majority's holding, by seeing such a patient, the physician may be reviving an otherwise time-barred claim. Thus, as applied by the majority, a doctrine that was instituted for the purpose of avoiding the "interrupt[ion] [of] corrective medical treatment" (*Young*, 91 NY2d at 296) could have the effect of deterring physicians from resuming treatment of former patients.

For the reasons discussed above, I believe that the record does not support the jury's finding that February 21, 2007 was the last date of a "continuous course of treatment" that included defendant's alleged malpractice in April 2004, and that defendant's posttrial motion for judgment notwithstanding the verdict should have been granted and the complaint dismissed. I therefore respectfully dissent to the extent the majority's affirms the judgment for plaintiff. Given my view that the statute of limitations issue is dispositive of this appeal, I need not reach the remaining issues defendant raises.