Rich v Lavelle (2023 NY Slip Op 02723)

Rich v Lavelle

2023 NY Slip Op 02723

Decided on May 18, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:May 18, 2023

534705
[*1]Shannon Rich, Respondent,
v
William F. Lavelle et al., Appellants.

Calendar Date:March 28, 2023

Before:Garry, P.J., Clark, Aarons, Reynolds Fitzgerald and Ceresia, JJ.

Gale Gale & Hunt, LLC, Fayetteville (Kevin T. Hunt of counsel), for appellants.
Schlather, Stumbar, Parks & Salk, LLP, Ithaca (Raymond M. Schlather of counsel), for respondent.

Garry, P.J.
Appeal from an order of the Supreme Court (Eugene D. Faughnan, J.), entered December 27, 2021 in Tioga County, which partially denied defendants' motion for partial summary judgment dismissing certain claims.
This medical malpractice action, commenced on January 27, 2016, stems from plaintiff's September 19, 2012 spinal fusion, performed by defendant William F. Lavelle, a partner of defendant Upstate Orthopedics, LLP, and certain postoperative care and treatment provided to her. Following joinder of issue, defendants moved for summary judgment dismissing, among other claims, any allegations of malpractice preceding July 29, 2013 as time-barred, arguing that a more than 16-month break in plaintiff's postoperative treatment, during which she engaged the services of other physicians, rendered the continuous treatment doctrine inapplicable. As relevant here, Supreme Court denied the motion, finding triable issues of fact as to the applicability of the tolling doctrine. Defendants appeal.
"An action for medical . . . malpractice must be commenced within [2½] years . . . of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure" (CPLR 214-a; see Lohnas v Luzi, 30 NY3d 752, 755-756 [2018]). Here, it is not disputed that defendants met their prima facie burden by demonstrating that plaintiff commenced this action more than 2½ years after the allegedly negligent acts or omissions that accrued before July 29, 2013 (see Massie v Crawford, 78 NY2d 516, 519 [1991]; Goldschmidt v Cortland Regional Med. Ctr., Inc., 190 AD3d 1212, 1216 [3d Dept 2021]; Waring v Kingston Diagnostic Radiology Ctr., 13 AD3d 1024, 1025 [3d Dept 2004]). The burden accordingly shifted to plaintiff to raise an issue of fact as to whether the statute of limitations was tolled as to said acts or omissions (see Massie v Crawford, 78 NY2d at 519).
"Under the continuous treatment doctrine, the time in which to bring a malpractice action is stayed when the course of treatment [that] includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint" (Allende v New York City Health & Hosps. Corp., 90 NY2d 333, 338 [1997] [internal quotation marks and citations omitted]). "The policy underlying the . . . doctrine seeks to maintain the physician-patient relationship in the belief that the most efficacious medical care will be obtained when the attending physician remains on a case from onset to cure"; "[i]mplicit in the policy is the recognition that the doctor not only is in a position to identify and correct his or her malpractice, but is best placed to do so" (McDermott v Torre, 56 NY2d 399, 408 [1982]). "Regardless of the absence of physical or personal contact between them in the interim, where the physician and patient reasonably intend the patient's uninterrupted reliance upon the physician's observation[*2], directions, concern, and responsibility for overseeing the patient's progress, the requirement for continuous care and treatment for the purpose of the [s]tatute of [l]imitations is . . . satisfied" (Richardson v Orentreich, 64 NY2d 896, 899 [1985]).
Here, plaintiff attended numerous postoperative appointments at Upstate Orthopedics from October 11, 2012 through May 23, 2013, primarily interacting with Lavelle's orthopedic fellow. During those appointments, plaintiff initially complained of back pain and pain in her shoulders, which largely resolved within six months. She later reported pain in the lateral and posterolateral aspect of her right thigh, as well as her right hip, which Lavelle and his fellow suspected could be bursitis, iliotibial band syndrome, apophysitis or, possibly, adjacent segment disease from her fusion. Having elected to discontinue the use of opioids and finding physical therapy to increase her pain, plaintiff's postoperative care and treatment from that point forward was conservative, consisting of the use of anti-inflammatory medications and the passage of time to permit healing from the major surgery. On June 7, 2013, plaintiff contacted Upstate Orthopedics to advise that her leg pain had become more extreme. Apart from a referral to a pain management clinic and steroid injections, which she declined, plaintiff was presented with the option for a myelogram, a diagnostic test described as invasive and not without risks. In consultation with Lavelle's fellow, she elected not to undergo the test at that time and instead "ride it out" until her next visit, when they could discuss the issue further. She then canceled her scheduled July 11, 2013 appointment, to give herself additional time to heal, and advised that she would call back to reschedule when she was ready.
On March 31, 2014, plaintiff visited her primary care office and saw a physician for what she suspected was a pinched nerve in her back, which, by then, was causing pain that radiated down her right leg into her calf. Due to certain scheduling issues, she did not follow up with that physician as directed. On September 11, 2014, plaintiff contacted Upstate Orthopedics to pursue the myelogram, but she canceled that appointment just over one week later. She testified that she canceled the test due to concerns over the risks of the procedure and her ability to take time off from work; defendants note that their records report that, at the time of cancellation, plaintiff stated that she was "finding a [n]ew d[octo]r." On September 29, 2014, plaintiff called her primary care office requesting a referral to a specific neurosurgeon who worked at the hospital where she was then employed; she testified that she was aware at that time that the neurosurgeon did not provide treatment for her underlying condition of scoliosis and that she was instead seeking treatment for what she believed to be "nerve pain." The neurosurgeon ordered a CT scan, which revealed medial breached [*3]pedicle screws from the spinal fusion. Plaintiff reached out to Lavelle to share this finding and ask his advice, stating that she was "not sure where to go from here" on October 20, 2014. They met to discuss the scan on October 24, 2014, and Lavelle performed a second surgery on November 4, 2014, removing several screws placed during the initial fusion. According to defendants' records, this surgery significantly improved plaintiff's right leg pain. Plaintiff ultimately terminated her relationship with Lavelle in March 2016, calling the practice and stating that she "has a new spine doctor."
As to the alleged break in treatment, continuous treatment may be "manifested in the form of a regularly scheduled appointment for the near future, agreed upon during that last visit, in conformance with the periodic appointments which characterized the treatment in the immediate past" (Richardson v Orentreich, 64 NY2d at 898-899). Contrary to defendants' suggestion, however, the lack of a preset appointment is not dispositive. Instead, and as defendants acknowledge, the requirement is that further treatment is reasonably anticipated by both the physician and patient. Here, both Lavelle and his fellow testified that plaintiff's postoperative appointments were initially every month or two to monitor more immediate concerns but that the appointments were expected to become further apart as time progressed, eventually with followups at the year marks. Both also explained that, sometimes, the most helpful form of postoperative care is simply to wait and allow the various sources of postoperative pain — e.g., pain from an incision or from altering the shape of the spine — to settle and then reevaluate any persistent pain. The fellow went on to testify that, if a scoliosis patient like plaintiff is going to use time to manage their pain, sometimes it may take more than a year before that patient will return. This is also not an instance where "the continuing nature of a diagnosis" is impermissibly set forth as a continuation of treatment (Nykorchuck v Henriques, 78 NY2d 255, 259 [1991] [internal quotation marks and citation omitted]). Both Lavelle and his fellow testified that the healing process following plaintiff's spinal fusion was expected to be lengthy, possibly seven years and up to a lifetime, and each expected her to attend postoperative appointments for at least two years. Based on the foregoing, we agree with Supreme Court that plaintiff has raised an issue of fact as to whether, notwithstanding the lengthy gap between office visits, both she and defendants reasonably intended a continuous course of treatment (see Lohnas v Luzi, 30 NY3d at 756; Gomez v Katz, 61 AD3d 108, 113-114 [2d Dept 2009]; Aulita v Chang, 44 AD3d 1206, 1208-1209 [3d Dept 2007]; compare Rizk v Cohen, 73 NY2d 98, 105 [1989]; Waring v Kingston Diagnostic Radiology Ctr., 13 AD3d at 1026).
As to plaintiff's treatment with other providers, "a patient's consultation with a new physician [*4]does not necessarily evince an intention, in and of itself, to terminate a continuous treating relationship with the original physician"; instead, "[w]hether or not a patient's consultation with a new physician constitutes a severance of continuous treatment with an earlier physician depends upon the reasons underlying the new consultation" (Gomez v Katz, 61 AD3d at 115-116). Although the submissions before us include medical records that suggest that plaintiff's engagement with the later physicians was, in part, due to her concern that her right leg pain arose following her surgery, we find that her deposition testimony was sufficient to raise an issue of fact as to whether she viewed that engagement as addressing an unrelated problem. Defendants urge that this testimony must be rejected as self-serving, but "self-serving statements of an interested party [that] refer to matters exclusively within that party's knowledge create an issue of credibility [that] should not be decided by the court but should be left for the trier of facts" (Nationwide Agribusiness Ins. Co. v Heath, 187 AD3d 1526, 1527 [4th Dept 2020] [internal quotation marks and citation omitted]). Additionally, neither of the later physicians actually treated plaintiff in relation to her spinal fusion, nor could they, and she requested that Lavelle perform the corrective surgery. It was not until September 2014 that any records report that plaintiff was seeking a new doctor, and it was not until March 2016 that she indicated she had found one. We therefore further agree with Supreme Court that, viewing the evidence in the light most favorable to plaintiff, it cannot be concluded, as a matter of law, that her visits with other physicians terminated her continuing postoperative treatment with defendants (see Lohnas v Luzi, 30 NY3d at 756; Clifford v Kates, 169 AD3d 1375, 1378 [4th Dept 2019]; Rudolph v Jerry Lynn, D.D.S., P.C., 16 AD3d 261, 262-263 [1st Dept 2005]; Melup v Morrissey, 3 AD3d 391, 391 [1st Dept 2004]). There are triable issues of fact concerning whether the continuous treatment doctrine tolls the statute of limitations on plaintiff's allegations of malpractice preceding July 29, 2013, and partial summary judgment was thus properly denied.[FN1]
Clark, Aarons, Reynolds Fitzgerald and Ceresia, JJ., concur.
ORDERED that the order is affirmed, with costs.

Footnotes

Footnote 1: To the extent that defendants argue that Supreme Court erred in finding the doctrine applicable as a matter of law, their reading of the court's order is belied by its plain text.