[874 NYS2d 161]

Maria Gomez, Respondent, et al., Plaintiff, v Neil Katz et al., Appellants.

Second Department, February 10, 2009

## APPEARANCES OF COUNSEL

*Rende, Ryan & Downes, LLP*, White Plains (*Roland T. Koke* of counsel), for appellants.

*Meagher & Meagher, P.C.*, White Plains (*Christopher B. Meagher* of counsel), for respondent.

## OPINION OF THE COURT

DILLON, J.

We are asked on this appeal to consider whether a patient's consultation with a new physician severs the patient's relationship with her initial physician for purposes of the "continuous treatment" toll of the statute of limitations. We also consider whether, under the circumstances of this case, a 24-month gap in the patient's treatment with her initial physician requires a finding that the physician's treatment is not continuous.

## I. Relevant Facts

On June 29, 1999, the defendant, Dr. Neil Katz, a member of the defendant Westchester Eye Associates (hereinafter together the defendants), performed LASIK surgery upon the eyes of the plaintiff Maria Gomez, to correct her vision. Dr. Katz and Gomez discussed the risks of the procedure prior to the surgery. Such risks included discomfort, visualizing halos, glare and distortion, infection, scarring, loss of best corrected visual acuity, the need for enhancement surgery, and the need for a cornea transplant.

Medical records and deposition testimony provided by Dr. Katz revealed postoperative visits on June 30, 1999, July 9, 1999, July 19, 1999, November 24, 1999, May 10, 2000 and 24 months later on May 16, 2002. Dr. Katz's chart also notes an undated postoperative telephone call from Gomez regarding her eyes. During many of these visits and during the undated phone call, Gomez complained of eye conditions that were consistent with some of the disclosed risks of LASIK surgery, such as glare

in her visual field, dry eyes, and blurry vision. Dr. Katz conducted two cornea topographic studies during the July 19, 1999 and November 24, 1999 postoperative consultations. Gomez's presentation on May 16, 2002, when she again complained of deteriorating vision, was the last time Dr. Katz examined her eyes.

On April 4, 11, and 18, 2002, Gomez presented to a nonparty ophthalmologist, Dr. Jay Lippman of the Eye Care Center in New Rochelle. Gomez complained to Dr. Lippman of dry eyes, blurry vision, and difficulties with reading fine print. She received a full eye examination and new prescription contact lenses.

Dr. Katz testified at his deposition that Gomez had been diagnosed with myopic and retinal degeneration prior to the LASIK surgery. He had preoperatively discussed this diagnosis with Gomez as potentially worsening over time regardless of whether the LASIK procedure was performed. In Dr. Katz's opinion, Gomez's postoperative complaints were attributable to her preexisting condition of central myopic and retinal degeneration. In contrast, Gomez maintains that she never experienced halos, glare, and dry eyes until after the LASIK procedure had been performed.

Gomez commenced this action by the filing of a summons and complaint on July 2, 2004, more than 2½ years after the performance of the LASIK surgery and the early postoperative visits. Gomez seeks to recover damages for significant permanent loss of vision sustained as a result of the alleged medical malpractice of the defendants. The defendants' answer contained an affirmative defense that the action was barred by the applicable statute of limitations.

The defendants moved for summary judgment on the ground that Gomez's action was time-barred under CPLR 214-a. In support of their motion, the defendants raised three specific points, which they reiterate on appeal. First, the defendants contend that continuous treatment ended with the postoperative follow-up visit on November 24, 1999, as the May 10, 2000 visit did not involve postoperative care, thus rendering the action untimely by more than two years. Second and alternatively, the defendants contend that the 24-month gap between Gomez's consultations with Dr. Katz on May 10, 2000 and May 16, 2002 is too attenuated to constitute "continuous treatment" under CPLR 214-a. Third, the defendants contend that Gomez's treatment with Dr. Lippman in April 2002 severed the continuity of Dr. Katz's treatment between May 2000 and May 2002.

In the order appealed from, the Supreme Court, inter alia, denied that branch of the defendants' motion which was for summary judgment dismissing the causes of action asserted by Gomez. The Supreme Court found a triable issue of fact as to whether Gomez received continuous treatment from the defendants for the same complaints giving rise to the medical malpractice claim. For reasons discussed below, and under the circumstances of this case, we affirm.

## II. The Continuous Treatment Doctrine

Pursuant to CPLR 214-a, "[a]n action for medical, dental or podiatric malpractice must be commenced within two years and six months of the act, omission or failure complained of" (*see generally Davis v City of New York*, 38 NY2d 257, 259 [1975]). However, the statute has a built-in toll that delays the running of the limitations period "where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure" (CPLR 214-a). Under the continuous treatment doctrine, the 2½ year period does not begin to run until the end of the course of treatment, "when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint" (*Nykorchuck v Henriques*, 78 NY2d 255, 258 [1991]; *see also Young v New York City Health & Hosps. Corp.*, 91 NY2d 291, 295 [1998]; *Allende v New York City Health & Hosps. Corp.*, 90 NY2d 333, 337 [1997]; *McDermott v Torre*, 56 NY2d 399, 405 [1982]).

The underlying premise of the continuous treatment doctrine is that the doctor-patient relationship is marked by continuing trust and confidence and that the patient should not be put to the disadvantage of questioning the doctor's skill in the midst of treatment, since the commencement of litigation during ongoing treatment necessarily interrupts the course of treatment itself (*see Massie v Crawford*, 78 NY2d 516, 519 [1991]; *see also Coyne v Bersani*, 61 NY2d 939, 940 [1984]; *Siegel v Kranis*, 29 AD2d 477, 480 [1968]). Implicitly, the doctrine also recognizes that treating physicians are in the best position to identify their own malpractice and to rectify their negligent acts or omissions (*see Allende v New York City Health & Hosps. Corp.*, 90 NY2d at 338; *Ganess v City of New York*, 85 NY2d 733, 735 [1995]; *Cooper v Kaplan*, 78 NY2d 1103, 1104 [1991]; *McDermott v Torre*, 56 NY2d at 408).

The continuous treatment doctrine contains three principal elements. The first is that the plaintiff continued to seek, and

in fact obtained, an actual course of treatment from the defendant physician during the relevant period (*see Nykorchuck v Henriques*, 78 NY2d at 259; *Stahl v Smud*, 210 AD2d 770, 771 [1994]; *Polizzano v Weiner*, 179 AD2d 803, 804 [1992]). The term "course of treatment" speaks to affirmative and ongoing conduct by the physician such as surgery, therapy, or the prescription of medications (*see Marabello v City of New York*, 99 AD2d 133, 146 [1984]). A mere continuation of a general doctor-patient relationship does not qualify as a course of treatment for purposes of the statutory toll (*see Nykorchuck v Henriques*, 78 NY2d at 259; *McDermott v Torre*, 56 NY2d at 405; *Nespola v Strang Cancer Prevention Ctr.*, 36 AD3d 774 [2007]; *Norum v Landau*, 22 AD3d 650, 652 [2005]). Similarly, continuing efforts to arrive at a diagnosis fall short of a course of treatment (*see Nykorchuck v Henriques*, 78 NY2d at 259; *McDermott v Torre*, 56 NY2d at 406), as does a physician's failure to properly diagnose a condition that prevents treatment altogether (*see Young v New York City Health & Hosps. Corp.*, 91 NY2d at 297; *Nykorchuck v Henriques*, 78 NY2d at 259; *McDermott v Torre*, 56 NY2d at 406).

A second element of the doctrine is that the course of treatment provided by the physician be for the same conditions or complaints underlying the plaintiff's medical malpractice claim (*see Nykorchuck v Henriques*, 78 NY2d at 259; *Borgia v City of New York*, 12 NY2d 151, 157 [1962]; *Couch v County of Suffolk*, 296 AD2d 194, 197 [2002]; *Lane v Feinberg*, 293 AD2d 654 [2002]; *Grassman v Slovin*, 206 AD2d 504 [1994]; *see e.g. Massie v Crawford*, 78 NY2d at 516 [continuous treatment doctrine inapplicable where routine periodic gynecological examinations were not related to the pelvic inflammatory disease allegedly caused by the intrauterine device installed by the physician 14 years earlier]; *Davis v City of New York*, 38 NY2d at 259-260 [contacts by telephone and mail nearly two years after the alleged malpractice insufficient to constitute medical services]).

The third element of the doctrine is that the physician's treatment be deemed "continuous." Continuity of treatment is often found to exist "when further treatment is explicitly anticipated by both physician and patient as manifested in the form of a regularly scheduled appointment for the near future, agreed upon during th[e] last visit, in conformance with the periodic appointments which characterized the treatment in the immediate past" (*Richardson v Orentreich*, 64 NY2d 896, 898-899 [1985]; *see Allende v New York City Health & Hosps. Corp.*, 90

NY2d at 338; *Cox v Kingsboro Med. Group*, 88 NY2d 904, 906-907 [1996]; *Roca v Perel*, 51 AD3d 757 [2008]; *Kaufmann v Fulop*, 47 AD3d 682, 684 [2008]; *Monello v Sottile, Megna*, 281 AD2d 463, 464 [2001]; *McInnis v Block*, 268 AD2d 509 [2000]). The law recognizes, however, that a discharge by a physician does not preclude application of the continuous treatment toll if the patient timely initiates a return visit to complain about and seek further treatment for conditions related to the earlier treatment (*see McDermott v Torre*, 56 NY2d at 406; *Ramos v Rakhmanchik*, 48 AD3d 657, 658 [2008]; *Shifrina v City of New York*, 5 AD3d 660, 662 [2004]; *Couch v County of Suffolk*, 296 AD2d at 197).

Here, the defendants established their prima facie entitlement to judgment as a matter of law by demonstrating that this action was commenced more than two years and six months after November 24, 1999 (*see* CPLR 214-a), which is the date of the last postoperative visit which the defendants concede represents a continuation of the LASIK surgery treatment (*see Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *Marks v Model*, 53 AD3d 533 [2008]; *Batiste v Brooklyn Hosp. Ctr.*, 255 AD2d 474, 475 [1998]; *see generally LaRocca v DeRicco*, 39 AD3d 486 [2007]). At issue here, in the context of summary judgment, is whether Gomez's papers in opposition raised a triable issue of fact as to further continuing treatment, requiring trial (*see Lane v Feinberg*, 293 AD2d at 655; *Weber v Bay Ridge Med. Group*, 220 AD2d 408, 409 [1995]; *Kasten v Blaustein*, 214 AD2d 539 [1995]; *Grassman v Slovin*, 206 AD2d at 504; *Washington v Elahi*, 192 AD2d 704 [1993]).

### III. The May 10, 2000 Visit as Continuous Treatment

The defendants maintain that the last continuing treatment, by which the 2½ year statute of limitations should be measured, was provided on November 24, 1999, rendering the action time-barred. They argue that the office visit which followed on May 10, 2000 does not qualify as continuous treatment, as Dr. Katz's medical chart for that date expressly notes that for the purpose of insurance coverage, it was not postoperative care. If the defendants are correct that Gomez's presentation on May 10, 2000 does not qualify as continuous treatment, then that date cannot act as a bridge to her last visit on May 16, 2002 against which the commencement of Gomez's action would be timely.

We find that, notwithstanding Dr. Katz's chart notation that the visit on May 10, 2000 did not involve postoperative

care, a question of fact exists under the circumstances of this case as to whether it actually did constitute postoperative care. Dr. Katz's chart entry, which conceivably could have been self-serving in light of Gomez's ongoing complaints, cannot be viewed as dispositive (*cf. Lawyer v Albany Med. Ctr. Hosp.*, 246 AD2d 800, 802 [1998]). The chart notation was made, according to Dr. Katz's deposition testimony, to assure Gomez coverage under a new policy of insurance. Further, Gomez's own self-serving statement in her opposing affidavit that all of her visits with Dr. Katz after November 24, 1999 were for treatment of postoperative complications and complaints secondary to the LASIK surgery is not dispositive, as continuing treatment must be anticipated by both the physician and the patient (*see Allende v New York City Health & Hosps. Corp.*, 90 NY2d at 338; *Cox v Kingsboro Med. Group*, 88 NY2d at 906; *Richardson v Orentreich*, 64 NY2d at 898-899; *Sarjoo v New York City Health & Hosps. Corp.*, 309 AD2d 34, 41 [2003]; *McInnis v Block*, 268 AD2d at 509).

Instead, an examination of the objective facts demonstrates that during the visit on May 10, 2000, Gomez complained of glare, blurred vision, the complete fogging of her right eye, and an impaired ability to read. Her complaints of glare and blurred vision on May 10, 2000 mimicked some of the complaints she made during the earlier visit on November 24, 1999. The documented complaints of glare and blurred vision are among the specific risk factors of LASIK surgery which Dr. Katz conceded at deposition had been discussed with Gomez prior to the procedure. Thus, there is an objective continuity from November 24, 1999 to May 10, 2000 of the ophthalmological complaints expressed to Dr. Katz, and a correlation of those complaints with the risk factors of the LASIK surgery Gomez had received (*cf. Klotz v Rabinowitz*, 252 AD2d 542 [1998]; *DiFilippi v Huntington Hosp.*, 203 AD2d 321 [1994]; *Winant v Freund*, 162 AD2d 681 [1990]). While the visit on May 10, 2000 might not have been scheduled at the conclusion of the visit on November 24, 1999, we recognize that, as a practical matter, it is not always possible to know at the conclusion of one visit with a physician whether a further visit with the physician may become indicated for the same condition within a reasonable time thereafter. Accordingly, Gomez's return visit to Dr. Katz on May 10, 2000 raises a triable issue of fact as to whether the services rendered by Dr. Katz represent continuous treatment within the scope of CPLR 214-a (*see Ramos v Rakhmanchik*, 48 AD3d at 658; *Shifrina v City of New York*, 5 AD3d at 662).

## IV. Treatment with Dr. Lippman in April 2002 Did Not as a Matter of Law Sever Continuous Treatment with Dr. Katz

The defendants maintain that any continuous treatment with Dr. Katz was severed when Gomez made three visits to another ophthalmologist, Dr. Lippman, on April 4, April 11 and April 18, 2002. The defendants further argue that Gomez's office visit with Dr. Katz on May 16, 2002, after her visits with Dr. Lippman, constitute, at best, a "renewal" of treatment, not encompassed by the continuous treatment doctrine (*see Rizk v Cohen*, 73 NY2d 98, 100 [1989]; *Spear v Rish*, 161 AD2d 197, 198 [1990]).

Whether or not a patient's consultation with a new physician constitutes a severance of continuous treatment with an earlier physician depends upon the reasons underlying the new consultation. The continuing "trust and confidence" of a patient in the physician is, by nature, a question of fact requiring an examination of the unique facts and circumstances of each case (*see Colodner v Columbia Presbyt. Med. Ctr.*, 223 AD2d 429 [1996]).

In some actions, courts have found that a patient's consultation with new medical providers severs the continuing trust and confidence in the original health care providers that underlie the continuous treatment doctrine. Thus, in *Allende v New York City Health & Hosps. Corp.* (90 NY2d 333 [1997]), the plaintiff therein saw several different physicians after her discharge from Lincoln Hospital Center, explaining in testimony that she "did not have any faith any more" in the hospital. The Court of Appeals logically determined that the plaintiff had lost continuing trust and confidence in the hospital, as a result of which the continuous treatment toll would be inapplicable (*see Allende v New York City Health & Hosps. Corp.*, 90 NY2d at 339).

The defendants rely upon, for a similar conclusion, *Kennedy v Decker* (237 AD2d 576 [1997]) from this Court and *Hall v Luthra* (206 AD2d 890 [1994]) from the Appellate Division, Fourth Department. Neither case is particularly helpful to the defendants since each is readily distinguishable on its facts. In *Kennedy*, the plaintiff sought to impute to her original physician the subsequent treatment she received from other physicians (*Kennedy v Decker*, 237 AD2d at 577), which is not at issue here. In *Hall*, the plaintiff ignored her physician's direction to return for further treatment and instead sought treatment from other physicians in the interim (*see Hall v Luthra*, 206 AD2d at 891). Here, Gomez did not refuse any direction by Dr. Katz to return to him for additional treatment.

At the other end of the interim treatment spectrum, there are cases which hold that a patient's consultation with a new physician does not necessarily evince an intention, in and of itself, to terminate a continuous treating relationship with the original physician (*see Rudolph v Jerry Lynn, D.D.S., P.C.*, 16 AD3d 261, 262-263 [2005]; *Marmol v Green*, 7 AD3d 682, 682-683 [2004]; *Melup v Morrissey*, 3 AD3d 391, 392 [2004]). In *Rudolph*, the defendant was sued for malpractice relative to the implantation of dental crowns. This Court held that continuous treatment was not interrupted by the plaintiff's interim checkup and teeth cleaning provided by another dentist, even though the plaintiff discussed her crowns with the interim dentist in furtherance of that checkup (*see Rudolph v Jerry Lynn, D.D.S., P.C.*, 16 AD3d at 262-263). In *Marmol*, continuous treatment with the original physician was not interrupted where the plaintiff consulted with other physicians to obtain, inter alia, second opinions (*see Marmol v Green*, 7 AD3d at 682-683). Similarly, in *Melup*, continuous treatment was not severed where the plaintiff consulted with other internists who did not provide actual treatment to the precise part of the body that had been treated by the defendants (*see Melup v Morrissey*, 3 AD3d at 391-392).

 Here, the plaintiff presented to Dr. Lippman to obtain new prescription contact lenses. Evidence in the record does not suggest an alternative basis for seeing Dr. Lippman. Necessarily, Dr. Lippman discussed with Gomez the condition of her eyes and performed a full eye examination. On this record, it cannot be determined as a matter of law that Gomez's visits to Dr. Lippman manifest a termination of her continuing trust and confidence in Dr. Katz with respect to her LASIK treatment and complications, particularly as Gomez consulted with Dr. Katz only one month later, on May 16, 2002 (*see Rudolph v Jerry Lynn, D.D.S., P.C.*, 16 AD3d at 262-263; *Marmol v Green*, 7 AD3d at 682-683; *Melup v Morrissey*, 3 AD3d at 391-392). Thus, the Supreme Court correctly identified a triable issue of fact as to whether or not Gomez continued to seek treatment from the defendants for the same complaints which gave rise to the malpractice action or if her treatment with Dr. Lippman severed such a relationship and rendered the continuous treatment doctrine inapplicable.

## V. The May 16, 2002 Visit as Continuous Treatment

We agree with the Supreme Court that a triable issue of fact exists as to whether Gomez's presentation to Dr. Katz on May

16, 2002 constituted continuous treatment, despite the 24-month gap that existed from the last office visit between Gomez and Dr. Katz.

As a threshold matter, Gomez complained on May 16, 2002 of symptoms similar to earlier complaints, such as frequent dry eyes, and there was a slight decrease in her visual acuity. These complaints arguably relate to earlier complaints and to the original LASIK surgery.

The more significant issue relative to the visit on May 16, 2002 is its delay measured from Gomez's previous visit to Dr. Katz on May 10, 2000. Decisional authorities do not draw a bright line between treatment that is sufficiently proximate in time as to be deemed "continuous," and treatment that is too chronologically remote to constitute a continuation of earlier treatment.

Here, 24 months elapsed between the office visits of May 10, 2000 and May 16, 2002. Triable issues of fact have been recognized in the context of continuous treatment for longer gaps in treatment than presented here (*e.g. Gehbauer v Baker*, 292 AD2d 255 [2002] [25-month gap]; *Klotz v Rabinowitz*, 252 AD2d at 543 [27-month gap]; *Edmonds v Getchonis*, 150 AD2d 879, 881 [1989] [27-month gap]; *Siegel v Wank*, 183 AD2d 158 [1992] [27-month gap]; *Levy v Schnader*, 96 AD2d 854, 854-855 [1983] [27-month gap]; *see also Rudolph v Jerry Lynn, D.D.S., P.C.*, 16 AD3d at 261 [22-month gap]). While the treatment gap here extends to almost the outer reaches of continuous treatment case law, it does not exceed the limits of decisional authority, and we cannot, on the record before us, conclude as a matter of law that the continuous treatment doctrine is inapplicable.

In light of our determination, the parties' remaining contentions either are without merit or have been rendered academic.

Accordingly, the order is affirmed insofar as appealed from.

SPOLZINO, J.P., RITTER and DICKERSON, JJ., concur.

Ordered that the order is affirmed insofar as appealed from, with costs.