Rivera v New York City Health & Hosps. Corp. (2024 NY Slip Op 24106)

[*1]

Rivera v New York City Health & Hosps. Corp.

2024 NY Slip Op 24106

Decided on April 9, 2024

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on April 9, 2024
Supreme Court, Kings County

Migdalia Rivera, Plaintiff,

against
New York City Health & Hospitals Corp., Defendants.

Index No. 509189/2018

Plaintiff
Stephen Larocca, Esq. (slarocca@burnsharris.com)
Harris, Keenan & Goldfarb PLLC
233 Broadway, Suite 900 9th Floor
New York, NY 10279
212-393-1000
Defendant
Joe B. Swart, Esq. (joe.swart@wilsonelser.com)
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, NY 10017
212-915-5483

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: 35-59
Defendant New York City Health and Hospitals Corporation ("HHC") moves (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment and dismissing all Plaintiff's claims against the movant, on the ground that no material issues of fact are in dispute. Within the substance of the moving papers, the defendant also argues that any claims arising from treatment prior to August 19, 2017, should be dismissed as outside the statute of limitations for purposes of the Notice of Claim, and that any claims interposed in the complaint arising from [*2]treatment prior to February 3, 2017, should be dismissed as time-barred by the statute of limitations. Plaintiff opposes the motion with respect to each of these issues.
Plaintiff Migdalia Rivera commenced this action on May 4, 2018, asserting claims of medical malpractice in connection to treatment and care rendered at Woodhull Medical Center ("Woodhull"), a HHC hospital, from approximately January 2011 through August 23, 2017. Plaintiff alleges her providers failed to diagnose a cervical rib on her right side and related complications, which led to thrombosis (blood clot) formation in her right arm. Plaintiff specifically alleges that the cervical rib was visible on a CT scan performed on September 8, 2015, but it was not noticed or recorded in the radiology report.
Plaintiff treated at Woodhull as her primary health care provider for various ailments since June 2003. She first presented with complaints of neck and shoulder pain to Woodhull attending physician, Wasfy Zaki, M.D. ("Dr. Zaki") on November 9, 2010. She was referred to the neurology department for a cervical spine MRI on January 27, 2011, which was reviewed and reported by Mark Richard Shafer, M.D. ("Dr. Shafer"). Plaintiff treated for cervicalgia and was prescribed medications in February 2011, with a follow-up appointment in June 2011.
Plaintiff received physical therapy at Woodhull for back pain from September 2011 through January 2012. Between November 2013 and September 2014, she was treated at Woodhull for an earache and abdominal pain, and she also treated at Woodhull's hematology clinic for hepatitis C.
On September 16, 2014, she was treated at Woodhull's emergency department with shortness of breath and numbness in her left arm and shoulder. On September 26, 2014, she appeared again with burning in her right arm and hand. On October 3, 2014, she complained of left arm pain which was attributed to diabetes and a pinched nerve. She was seen in the emergency department and medical clinic on multiple occasions in 2014-2015 for diabetes, arthritis, GERD, depression, hepatitis C, chest pain, and pain in her left upper extremities, including tendonitis which she attributed to a work accident. She was seen by Dr. Zaki in January 2015 and referred for physical therapy and rehabilitation for left upper extremity pain through April 2015.
Plaintiff presented at the Woodhull emergency department and ENT clinic with ear pain in August 2015. On examination at the ENT clinic, a lump was found in the right side of her neck, and a CT scan with contrast was performed on September 8, 2015. Dr. Shafer was the radiology employee at Woodhull who reviewed and reported the CT scan results. In his report, he noted the presence of lymph nodes and no evidence of a definite mass, but he did not include any findings regarding the cervical rib or subclavian artery. Upon review of the same CT films, both parties' radiology experts affirm that the cervical rib is visible (see Dr. Sherman aff, ¶ 16; Plaintiff Expert B aff, ¶ 8). Dr. Shafer also identified the cervical rib in multiple images during his deposition (Dr. Shafer deposition tr at 55-63). During a follow-up appointment on September 17, 2015, the ENT physician recorded the CT scan report as "clinically negative," and Plaintiff was advised to follow up with the pain management and neurology clinics.
On March 14, 2016, Plaintiff saw Dr. Zaki for prescription refills and care for her diabetes and hepatitis. On a follow-up visit on June 20, 2016, Plaintiff complained to Dr. Zaki of neck pain in addition to her other symptoms.
On July 13, 2017, Plaintiff presented in the emergency department with sharp pain radiating from her right hand and followed up with the hand clinic, where she was diagnosed with osteoarthritis. She also had surgery to remove a ganglion cyst on August 9. On August 23, [*3]2017, Plaintiff saw Dr. Zaki for a regular follow-up appointment and complained of pain in her right upper arm, aggravated by movement, for the last month. On examination, he found no discoloration, swelling, or tenderness. He diagnosed Plaintiff with a muscle sprain and diabetic neuropathy and prescribed Gabapentin and Tylenol.
On August 28, 2017, Plaintiff experienced sharp pain and coldness/reduction in pulse in her right arm while in Cuba. She was admitted to the Cira Garcia Central Clinic, where a CT angiography revealed aneurysmal dilatation and a blood clot in the right subclavian artery caused by a cervical rib. The physicians were able to perform a thrombectomy to clear the blood clot and reestablish blood flow. On September 26, 2017, Plaintiff underwent resection of the cervical rib and right subclavian to axillary vascular bypass at NYU Langone/Lutheran Medical Center.
Plaintiff alleges that HHC/Woodhull departed from good and accepted standards of medical practice by failing to properly diagnose her cervical rib anomaly, despite the images from her CT scan on September 8, 2015, and her history of complaints of neck, shoulder, and arm/hand pain. Plaintiff further alleges that these departures were a proximate cause of her alleged injuries, including the formation of a blood clot, the need for an emergency procedure, and persisting numbness and disability to her right arm.
As an initial matter, HHC seeks to dismiss all Plaintiff's claims pertaining to treatment prior to August 19, 2017, on the grounds that allegations of malpractice for any medical treatment prior to the 90 days before service of the Notice of Claim on November 17, 2017 are time-barred. Similarly, HHC argues that any claims pertaining to treatment before February 3, 2017, a year and 90 days prior to the service of the summons and complaint, are time-barred by the statute of limitations (see General Municipal Law § 50-i [1]).
Pursuant to General Municipal Law § 50-e, a notice of claim against a municipal corporation must be served within 90 days after the claim arises. A medical malpractice claim "accrues on the date when the alleged original negligent act or omission occurred" (Ortiz v New York City Health & Hospitals Corporation, 187 AD3d 929, 930 [2d Dept 2020], quoting Young v New York City Health & Hospitals Corp., 91 NY2d 291, 295 [1998]). In addition, the action itself must be commenced within one year and 90 days after the claim arises, pursuant to General Municipal Law § 50-i (1). However, "where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure," the limitations period does not begin to run until the last date of treatment for that condition (see CPLR 214-a; Gray v Wyckoff Heights Medical Center, 155 AD3d 616 [2d Dept 2017]). The continuous treatment doctrine also tolls the 90-day period within which the plaintiff must file their notice of claim (Baltzer v Westchester Medical Center, 209 AD3d 815, 816 [2d Dept 2022]; see also Plummer ex rel. Heron v New York City Health and Hospitals Corp., 98 NY2d 263 [2002]).
The essence of the continuous treatment toll is the "continuing trust and confidence" of the provider-patient relationship, requiring an inquiry into "the unique facts and circumstances of each case" (Gomez v Katz, 61 AD3d 108, 111-115 [2d Dept 2009]). The Second Department has outlined the three fundamental elements of such treatment: "(1) the patient 'continued to seek, and in fact obtained, an actual course of treatment from the defendant physician during the relevant period'; (2) the course of treatment was 'for the same conditions or complaints underlying the plaintiff's medical malpractice claim'; and (3) the treatment is 'continuous'" (Hillary v Gerstein, 178 AD3d 674 [2d Dept 2019], citing Gomez).
The "actual course of treatment" of the first element requires a showing beyond a general doctor/patient relationship; this element "speaks to affirmative and ongoing conduct by the [*4]physician such as surgery, therapy, or the prescription of medications" (Gomez, at 112). Under the second element, there must be at least some "objective continuity" between the plaintiff's complaints at the times at issue, and those complaints must correlate to the underlying malpractice claim (id., at 114). Finally, the "continuous" element is present "when further treatment is explicitly anticipated by both physician and patient," which can be demonstrated by a scheduled or agreed-upon future appointment, or where "the patient timely initiates a return visit to complain about and seek further treatment for conditions related to the earlier treatment" (id., at 113).
Additionally, the continuous treatment doctrine applies to a patient who was treated by multiple doctors employed by the same practice or group, including a diagnostician who is an agent or "otherwise acts in relevant association" with those treating or monitoring the patient's condition (Kaufmann v Fulop, 47 AD3d 682 [2d Dept 2008]; see also Scalcione v Winthrop University Hosp., 53 AD3d 605 [2d Dept 2008]).
Continuous treatment cannot exist if there is no treatment for the condition or its symptoms due to failure to diagnose (see Proano v Gutman, 211 AD3d 978 [2d Dept 2022]). General health check-ups and treatment for unrelated symptoms are inapplicable to the continuous treatment doctrine (see Chambers v Mirkinson, 68 AD3d 702, 706 [2d Dept 2009]). However, "a defendant cannot default the application of the continuous treatment doctrine merely because of a failure to make a correct diagnosis as to the underlying condition, if the defendant treated the plaintiff continuously over the relevant time period for symptoms that are ultimately traced to that condition" (Cohen v Gold, 165 AD3d 879, 882 [2d Dept 2018] [emphasis added]). For example, the Second Department found the statute of limitations was tolled where a plaintiff "received continuous treatment for her loose teeth and receding gums, which allegedly were symptomatic of the tumor the defendants failed to diagnose" (Miccio v Gerdis, 120 AD3d 639, 640 [2d Dept 2014]). "The failure to make the correct diagnosis as to the underlying condition while continuing to treat the symptoms does not mean, for the purposes of continuity, that there has not been treatment" (id.).
In one case involving the alleged failure to diagnose the plaintiff with multiple sclerosis, the plaintiff demonstrated that she had "complained of symptoms related to MS during the appointments on April 27, 2004, and July 14, 2004 [the dates of alleged malpractice], and continued to complain of such symptoms on March 7, 2005, a date falling within the limitations period" (Chambers, at 706 [2d Dept 2009]). That plaintiff also established that the defendants "addressed the symptoms by administering therapy, ordering testing, or making referrals to specialists" (id.). The appellate court held this was sufficient to demonstrate continuous treatment, precluding dismissal of her claims arising on and after April 27, 2004.
Continuous treatment is not necessarily severed by the patient breaking or postponing an anticipated follow-up appointment (see Hillary v Gerstein, at 675 [applying the continuous treatment doctrine where the patient committed suicide before her next scheduled appointment]). It is also not severed by significant gaps in time between the plaintiff's visits seeking treatment for related symptoms. In Gomez, the court applied the continuous treatment doctrine where, during an eye doctor visit five months after the plaintiff's last post-operative appointment, the patient objectively "complained of glare, blurred vision, the complete fogging of her right eye, and an impaired ability to read," which "mimicked some of the complaints she made" during the previous appointment and the risks associated with her surgery (Gomez, at 114). Following that visit, the patient did not return for another 24 months, but she presented with "symptoms similar [*5]to earlier complaints, such as frequent dry eyes," which related to her prior treatment and the underlying malpractice claim (id., at 117).
When considering a gap between treatments, it was well established in the Second Department before 2018 that "where the gap between treatments exceeds the applicable statute of limitations period, the continuity of treatment is broken" (see Bulger v Nassau County Medical Center, 266 AD2d 212 [2d Dept 1999]). However, that rule has been expressly abrogated by the Court of Appeals, taking the more lenient view that "a gap in treatment longer than the statute of limitations is not per se dispositive" in a case where there was a break in treatment exceeding 30 months (see Lohnas v Luzi, 30 NY3d 752, 756 [2018] ["To the extent that lower courts have held to the contrary [citing Bulger et al], those cases should not be followed"]). As held by the court in Lohnas, even when there is a long break or sporadic treatment, there are other factors that may point toward "ongoing treatment of a medical condition," such as the patient in that case who made numerous visits to the physician in question over seven years and saw no other doctor except when referred by him.
Here, the defendant HHC establishes prima facie that the Notice of Claim was served on November 17, 2017, and therefore any medical malpractice claim arising from treatment prior to August 19, 2017, should be dismissed as untimely. However, Plaintiff cites to relevant treatment records in opposition to demonstrate that the limitations period is tolled by the continuous treatment doctrine.
It is clear from the medical records that Plaintiff was treated for a host of medical problems at Woodhull, not all related to her undiagnosed cervical rib. However, beginning in November 2010, she was treated by Dr. Zaki for cervicalgia (pain in her neck/cervical spine), and he referred her to other physicians in the Woodhull neurology and orthopedic clinics, where an MRI was performed in January 2011. On visits throughout this time period, she was prescribed pain medication, and she was scheduled for a follow-up appointment in six months (see Exhibit M, at 68-69, 71, 82-83).
At her return appointment in June 2011, she had unrelated symptoms and there were no documented complaints of neck, shoulder, or upper extremity pain. There is no dispute that Plaintiff's treatment at Woodhull for various other conditions, such as lower back pain, earache, and abdominal pain, from June 2011 through September 11, 2014, were not connected to her cervical rib condition, and Plaintiff does not allege any malpractice occurred on those dates. Her next relevant treatment period began in September 2014 with complaints of bilateral numbness and burning in her shoulder, arm, and hand (Exhibit M, at 163-175).
This gap in treatment for cervical rib symptoms between February 2011 and September 2014 far exceeded the applicable statute of limitations, but this is no longer dispositive as a matter of law. Here, as in Lohnas, Plaintiff's treatment with a single health provider for specific symptoms underlying her condition, even if those symptoms were intermittent and on an "as needed" basis, demonstrate an objective continuity in her treatment that withstands per se dismissal of the pre-2014 claims. This is especially true considering her long-running relationship to Woodhull before and after that gap (see Lohnas, at 756, plaintiff "considered defendant her only doctor").
When Plaintiff returned in September 2014 for symptoms related to her cervical rib, she was treated with prescription medication and physical therapy (for upper extremity pain), which continued through April 2015. Her shoulder and neck pain continued to appear as a primary or secondary symptom throughout her 2015 medical records, and she was treated with physical [*6]therapy and prescribed medication (Exhibit M, at 268, 275-280, 291, 320). Despite the 2011-2014 gap, Plaintiff clearly resumed a course of treatment for symptoms connected to her cervical rib, and she saw no other providers in the interim.
As in the Hillary case, the plaintiff was a "no show" for her May 2015 physical therapy appointment, but that does not negate the fact that further therapy was scheduled and anticipated at the time of her last visit. Later that year, on September 8, 2015, Plaintiff had a CT scan arising from ear and neck pain. This relatively short gap in treatment clearly did not sever Plaintiff's relationship with HHC/Woodhull, as she continued to return with symptoms both related and unrelated to her cervical rib. At her radiology referral on September 8, 2015, Dr. Shafer noted her chief diagnosis of cervicalgia and complaints of right nerve pain. In other words, in April and September — less than six months apart — she presented with generalized symptoms of a cervical rib. Despite her cessation of physical therapy, this demonstrates a timely return to treat related symptoms.
After Plaintiff's CT scan, she had a follow-up appointment on September 17, 2015, but after that appointment she failed to follow up with the pain management clinic as she was advised to do. However, she ultimately returned to Woodhull with similar complaints and obtained relevant treatment for neck, hand, and arm pain. On June 20, 2016, Dr. Zaki testified that "she complained at that time of diabetes, hypertension and anxiety, and she has neck pains also" (Dr. Zaki deposition tr at 36, 41 [emphasis added]). Neck pains were noted on her chart as well (Exhibit M, at 421-423). She also complained of numbness and tingling in her hands, which were diagnosed as diabetic neuropathy and possible spondylosis. Dr. Zaki referred her to physical therapy and gave her pain medication (Dr. Zaki deposition tr at 45), once again demonstrating a course of treatment and anticipation of follow-up visits.
Plaintiff's last visit to Dr. Zaki at Woodhull was on August 23, 2017. Although she recently had an unrelated surgery (also at Woodhull) to remove a cyst from her hand, her primary complaint at that time was radiating pain in her right arm, consistent with her cervical rib and subclavian artery condition. She would be treated for a blood clot while out of the country less than a week later.
Plaintiff's showing that she was repeatedly issued prescriptions for her complaints of neck, shoulder, arm, and/or hand pain demonstrates a continuing physician/patient relationship, as does a sequence of physical therapy appointments (see Murray v Charap, 150 AD3d 752 [2d Dept 2017] [the doctor "prescribed and refilled the plaintiff's prescriptions for cholesterol-lowering medications . . . and had a conversation with the plaintiff to make sure he was taking his medication" on the relevant treatment dates]). Therefore, Plaintiff has made a showing that there was an "actual course of treatment" for her underlying symptoms.
The symptoms in question are also directly related to Plaintiff's underlying malpractice claim, i.e., the failure to correctly diagnose and treat her cervical rib. Throughout Plaintiff's medical history at Woodhull, she exhibited recurring and long-running symptoms of Thoracic Outlet Syndrome: a compression of nerves and arteries from the cervical rib, which can manifest in pain and numbness in the neck, shoulders, and upper extremities. Just as the Gomez patient had documented complaints of vision issues, the Miccio patient complained of receding gums, and the Chambers patient showed recurring symptoms of MS, Plaintiff's complaints of generalized neck and shoulder pain, right-sided pain and numbness in her arm and hand, and compensatory pain in her left arm and hand on the relevant dates are all symptoms of the condition underlying this action.
Finally, as to the "continuous" element, the pertinent question is whether further treatment was anticipated, either by a future scheduled appointment or timely return of the patient. As already addressed, the spans of time during which Plaintiff did not appear for appointments or returned with different medical conditions do not disprove that her treatment was "continuous," but in fact bolster the argument that she solely sought treatment with Dr. Zaki and HHC/Woodhull whenever issues and symptoms related to her cervical rib appeared. Notably, neither of the gaps between September 2015 and June 2016, nor between June 2016 and August 2017, exceeded the statute of limitations period (one year and 90 days) which the Second Department long held was the upper limit of the continuous treatment doctrine, and the Court of Appeals has since ruled even longer gaps are permissible. There is objective continuity between Plaintiff's complaints and treatment for cervicalgia and/or right upper extremity pain on the September 2015, June 2016, and August 2017 dates in particular. As her effective last date of treatment, the August 23 appointment falls within 90 days of Plaintiff's notice of claim and the statute of limitations for this action.
In summary, Plaintiff consistently sought treatment for complaints involving the cervical spine and upper extremities from Dr. Zaki and other Woodhull specialists, radiologists, and physical therapists to whom she was referred within the health care center. Her records demonstrate a relationship of continuing trust and confidence with respect to her specific neck and upper extremity pains, in addition to her other diagnosed conditions. On multiple occasions she was prescribed medications and physical therapy, establishing a "course of treatment" for these pains and not merely general health check-ups. Although she received no diagnosis of a cervical rib or its complications, there is sufficient evidence in the record that she was continuously treated for symptoms of this underlying condition. For these reasons, the medical malpractice claims herein fall within the continuous treatment doctrine and thus are continuous to her last date of treatment on August 23, 2017. The Notice of Claim was timely filed as to those claims arising from this earlier treatment, up to and, including August 23, 2017. Furthermore, the action is timely as to these dates of treatment.
As to the substance of the action, Defendant HHC moves for summary judgment on the basis that there are no issues of fact as to Plaintiff's allegations of medical malpractice. Generally, "[i]n determining a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party" (Stukas v Streiter, 83 AD3d 18, 22 [2d Dept 2011]). In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:
"The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce [*7]conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted]).
In support of this motion for summary judgment, HHC submits an expert affirmation from Charles Bardes, M.D. ("Dr. Bardes"), a physician certified in internal medicine, and an expert affirmation from Craig Sherman, M.D. ("Dr. Sherman"), a physician certified in diagnostic radiology, as well as medical records and depositions.
Defendants' internal medicine expert, Dr. Bardes, explains that a cervical rib is an abnormal extra rib which can attach to the top of the first rib. It is often asymptomatic but can manifest when it "impinges on a nerve or a blood vessel, causing pain, tingling, weakness, and/or numbness in the shoulder or upper extremity on the side where the cervical rib is located, and/or discoloration, weakness, swelling, coldness, and/or throbbing in the affected upper extremity." He opines that it is typically "only diagnosed when clinical findings give rise to a suspicion of a cervical rib," but it is occasionally discovered as a "collateral finding" without symptoms.
Based on his review of the record, Dr. Bardes opines that all treatment and care rendered to Plaintiff at Woodhull was within good and accepted standards of medical practice, dating back to Plaintiff's first complaints of neck and shoulder pain on November 9, 2010. Dr. Bardes opines that when Plaintiff presented at Woodhull in November 2010 with sharp neck and shoulder pain, which she attributed to heavy lifting, she was appropriately referred for a cervical spine MRI which revealed "moderate to severe degenerative changes" and showed no evidence of a cervical rib, and thereafter she was properly treated for cervicalgia with pain medications.
After her MRI and treatment at the clinic on February 9, 2011, Plaintiff did not make further complaints about her neck or shoulder during her June 2011 appointment. Dr Bardes opines that during the physical therapy and treatment Plaintiff received from November 2010 to February 2011, she did not present with any clinical symptoms in her right upper extremity that should have led to discovery of the cervical rib.
Plaintiff's next relevant treatment period began in September 2014. Dr. Bardes opines that her visit to the ER on September 16, 2014, with pain in her left shoulder and numbness in her left arm, was not indicative of a cervical rib on the right side. Although she reported a burning pain in her right arm and hand on September 26, 2014, Dr. Bardes opines that her bilateral symptoms were reasonably connected to her diabetes by the treating physician, and a physical examination revealed no swelling, tenderness, or discoloration. At her follow-up visit on October 3, 2014, she complained only about her left arm and not her right extremity. Because of her known diabetes and an apparent work-related injury, Dr. Bardes opines her diagnosis and treatment (including a course of medication and physical therapy through April 2015) was "reasonable, appropriate, and proper" based on her symptoms and history.
In September 2015, Dr. Bardes opines that there were no symptoms or indication of cervical rib from Plaintiff's presentation at the ENT clinic. The radiology report did not include any findings of a cervical rib, and Dr. Bardes opines that her providers at the clinic "were justified in relying on that report." Over the next two years, inclusive of her June 2016 appointment with Dr. Zaki, Dr. Bardes opines that Plaintiff treated at Woodhull for various conditions and ailments, and nothing in her presentation or history suggested a cervical rib or [*8]related complications.
Dr. Bardes opines that when Plaintiff was treated for right arm/hand pain in July 2017, it was unconnected to her cervical rib. The pain radiated locally from her right thumb, not her upper extremity or neck, and Dr. Bardes opines that she was appropriately referred to the hand clinic for treatment and diagnosed with osteoarthritis.
Finally, Dr. Bardes opines that the treatment rendered to Plaintiff on August 23, 2017, by Dr. Zaki was within accepted standards of medical practice. At that time, Plaintiff complained of seemingly "acute" pain in her right arm for the previous month. Dr. Zaki examined her and found no discoloration, clubbing, swelling, or tenderness, i.e., symptoms of thrombosis. Dr. Bardes opines that from Plaintiff's presentation and history, her pain could have been caused by "any number of things, including arthritis, diabetes, or muscle sprain," and it was "reasonable to treat the pain with medication and instruct the plaintiff to return for a reevaluation in 3 months." Dr. Bardes opines that there was no specific indication of a cervical rib, nor any reason to order testing to diagnose or rule out the presence of a cervical rib.
Dr. Bardes opines that Plaintiff's subclavian artery thrombus developed suddenly the day she was treated in Cuba, based on her difference in symptoms on August 28. 2017, e.g., "sudden sharp pain, coldness, and pallor in the extremity." He opines that these symptoms were not present in her last visit to Woodhull, nor was there any "pattern of symptoms or complaints that suggested a blocked artery," and therefore her condition "could not have been diagnosed or predicted prior to that date."
Overall, Dr. Bardes opines that "the mere presence of a cervical rib is not concerning," and if it is diagnosed as a collateral finding without other symptoms, the appropriate course of treatment is to "do nothing aside from monitoring the cervical rib, for as long as it remains asymptomatic." He opines that even if the cervical rib had been discovered earlier, no treatment or resection surgery would have been recommended, as surgery is a "last resort" that was not warranted at any time she was evaluated at Woodhull. Therefore, based on his expert opinion, any alleged failure by HHC/Woodhull to diagnose her cervical rib did not change the course of events for Plaintiff or affect her subsequent treatment after a blood clot developed.
Defendant HHC's radiology expert, Dr. Sherman, specifically addresses the January 2011 MRI of Plaintiff's cervical spine. Dr. Sherman opines that a cervical rib is "difficult to visualize on many types of radiological studies" and it is especially difficult to visualize on an MRI of the cervical spine. Instead, a cervical rib is most visible from a coronal view "dividing the body into front and back," which was not performed at that time. Dr. Sherman reviewed the MRI films from January 27, 2011, and opines that Plaintiff's cervical rib is not identifiable in them. Further, Dr. Sherman opines that Plaintiff did not exhibit any clinical signs that pointed toward a cervical rib at that time, because her chief complaint was neck pain and not "pain, tingling, weakness, and/or numbness in the shoulder or upper extremity on the side where the cervical rib is located." Therefore, he opines the appropriate radiological test was performed in January 2011 and the radiologist's report was proper.
With respect to Plaintiff's September 8, 2015 CT scan, Dr. Sherman affirms that he reviewed the film and Plaintiff's cervical rib is visible. Dr. Shafer, the radiologist who originally reviewed the film, testified that he most likely did not report the cervical rib because he wasn't looking for it or considered it incidental (Dr. Shafer deposition tr, at 52; 65). Dr. Sherman opines that this CT scan was ordered in response to Plaintiff's chief complaint of upper neck pain and a tender mass on the right side of her neck, which was unrelated to the cervical rib. Dr. Sherman [*9]therefore characterizes the cervical rib as an "incidental finding" and opines that Dr. Shafer did not deviate from radiological standards by not including it in the report. Dr. Sherman opines that even if Dr. Shafer failed to notice the cervical rib, he was operating within the proper standard of care, because the focus of his review was Plaintiff's lymph nodes and he reported them in detail. According to Dr. Sherman, it would risk "failing to communicate to the physician-clinician ordering the test the most pertinent information" if a radiologist included every incidental finding or observation in their report.
Based on the submissions, HHC makes a prima facie case that all the treatment and care rendered to Plaintiff by Dr. Zaki, radiologist Dr. Shafer, and other Woodhull physicians from November 9, 2010, through August 23, 2017, was in accordance with good and accepted medical standards, and that no negligence on HHC's part contributed to Plaintiff's alleged injuries.
In opposition, Plaintiff submits an expert affirmation from a board-certified radiologist and physician, (name of expert redacted). Plaintiff also submits an expert affirmation from a licensed physician certified in vascular surgery, (name of expert redacted). The Court was presented with the signed, unredacted affirmations of both experts for in camera inspection.
Plaintiff's radiology expert does not address the January 2011 MRI. However, the expert does address Dr. Shafer's alleged failure to notice and/or report the cervical rib and post-stenotic dilatation on the September 8, 2015 CT scan. Upon review of the CT film, the radiology expert opines that the right-sided cervical rib could be clearly seen and recognized in multiple images. The expert also identified a dilatation of the right subclavian artery which was "consistent with and suggestive of post-stenotic dilatation." In the expert's opinion, the failure of Dr. Shafer to include either of these findings in his report was a departure from good and accepted radiological standards, even if the scan was centered on another matter. Plaintiff's radiology expert counters Dr. Sherman's expert opinion that a cervical rib is typically asymptomatic and therefore not a pertinent detail. The expert notes that it is "not the radiologist's role to plan the treatment of a patient after the film but rather to report on all findings, particularly abnormal ones, incidental or not" (emphasis added).
Plaintiff's vascular surgery expert also reviewed the CT film and agreed that the cervical rib and post-stenotic dilatation of the artery were visible. The expert opines that a cervical rib is often discovered as an incidental or collateral finding, or during a "general and nonspecific medical workup." According to the expert, patients with a cervical rib are typically referred by their treating physician to a vascular surgeon, "who must then determine whether serious, though asymptomatic, conditions such as arterial or venous stenosis exist."
The vascular surgery expert emphasizes that the CT scan not only revealed the presence of a cervical rib but the fact that rib was constricting an artery. The expert opines that a cervical rib alone should be evaluated by a specialist or at least "noted as a part of the patient's medical history for future reference if the patient later develops unexplained symptoms." When combined with evidence of stenosis, the expert opines that Plaintiff's CT scan demonstrated a "dangerous condition" which can lead to aneurysm and blood clot formation, and which may ultimately result in loss of use of the limb or amputation if not properly treated. Therefore, the expert opines that it was a departure from good and accepted medical standards for the radiologist, Dr. Shafer, to fail to notice and/or report these findings.
Furthermore, Plaintiff's vascular surgery expert opines that these omissions from the CT scan report were a proximate cause of Plaintiff's alleged injuries. Dr. Zaki testified that Plaintiff's CT scan was available to him on all subsequent visits, and that it is his usual custom to "review [*10]all the tests" of patients before him, including the reports from any prior radiological studies, if not the actual films (Dr. Zaki deposition tr, at 25-26). Plaintiff's vascular surgery expert opines that her misdiagnosed symptoms were "at least in part a consequence" of the radiologist's report, which Dr. Zaki and other Woodhull providers relied on in subsequent visits from September 17, 2015 through August 23, 2017.
Plaintiff's expert counters the opinion of Dr. Bardes (who does not have credentials in vascular surgery) that resection surgery is a "last resort" and would not have been recommended in Plaintiff's case, even if the rib had been discovered earlier. According to Plaintiff's expert, cervical rib resection has "a high rate of success and a low rate of complications," and early treatment is preferable even before symptoms appear, because "damage to the artery is significant" if the condition progresses further. Based on the facts in the record and a more complete reading of the CT scan, Plaintiff's expert goes as far as opining that any "competent medical practitioner" would have recommended resection, because post-stenotic dilatation of the subclavian artery "is an early finding indicating injury and compression of the artery that will invariably lead to an aneurysm and thrombus formation."
Contrary to Dr. Bardes's opinion that Plaintiff's subclavian artery thrombus did not develop until she was treated in Cuba on August 28, 2017, Plaintiff's expert opines that thrombus was present as early as September 2015 and the full occlusion of her artery was an "entirely predictable and quite likely" event. Plaintiff's expert opines that if Plaintiff's condition had been correctly recognized and reported in the CT scan, the appropriate treatment would have been referral to a vascular surgeon and cervical rib resection before her subclavian artery stenosis progressed to the point it did. Thus, the expert opines that the HHC radiologist's departures led to a worsening of the condition which ultimately "required emergency surgical intervention and repair." Without the delay in diagnosis, the expert opines Plaintiff would not have suffered these further complications, including the formation of a blood clot and the need for an emergency thrombectomy and, subsequently, a vascular bypass at NYU Langone/Lutheran Medical Center.
Notwithstanding the claims related to the September 8, 2015 CT scan, the vascular surgery expert opines only generally that Plaintiff's earlier neck and shoulder pain were symptoms of Thoracic Outlet Syndrome, and the expert does not make any comment as to Woodhull's alleged departures from good and accepted medical practice. Plaintiff's expert notes that cervical ribs are frequently diagnosed "as an incidental and unexpected finding on chest x-rays and CT scans." Plaintiff's expert offers no facts or opinion to indicate that any such tests were performed or should have been performed during the 2010-2011 period. Neither of Plaintiff's experts refute the opinions of Dr. Sherman that the appropriate test was ordered and performed in January 2011, and that a cervical spine MRI is not one that typically detects the presence of a cervical rib.
Plaintiff's vascular surgery expert disagrees with Dr. Bardes's opinion that Plaintiff's primarily left-sided complaints from September 2014 through April 2015 had no connection to her cervical rib, opining that compensatory pain "can develop on the non-affected side" and is therefore a potential symptom. Nonetheless, the expert does not counter Dr. Bardes's opinion that it was reasonable to attribute her bilateral tingling and left-sided symptoms to diabetes and a work-related injury, based on her presentation and history. The expert also does not counter Dr. Bardes's opinion that no additional diagnostic workup was necessary, or that the treatment Plaintiff received in this period was proper. Although the vascular surgery expert attributes many of Plaintiff's earlier symptoms to the cervical rib in hindsight, the expert raises no evidence that a [*11]front-to-back chest x-ray, CT scan, or other diagnostic workup should have been performed to identify the rib.
Finally, Plaintiff's experts do not raise any issues of fact as to the general malpractice of Dr. Zaki or other treating physicians from September 17, 2015 through August 23, 2017. Throughout their affirmations, Plaintiffs' experts opine that her cervical rib and post-stenotic dilatation should have been recognized and treated by referral to a vascular surgeon, but they refer solely to the CT scan report prepared by Dr. Shafer as the finding that should have given rise to the diagnosis. Again, although Plaintiff's vascular surgery expert opines generally that Plaintiff exhibited symptoms of a cervical rib and Thoracic Outlet Syndrome, the expert raises no evidence or argument that her condition should have been diagnosed by any testing or clinical findings other than the CT scan report, which was not "properly interpreted and reported" on September 8, 2015. Plaintiff does not refute Dr. Bardes's opinion that Dr. Shafer's CT scan report was justifiably relied on by Dr. Zaki and others during Plaintiff's subsequent visits after September 8, 2015. The vascular surgery expert also does not counter Dr. Bardes's opinion that Dr. Zaki acted in accordance with good and accepted medical standards on August 23, 2017, based on his examination of Plaintiff and her available medical history. In fact, Plaintiff's expert does not address this visit at all or assert any malpractice on the part of Dr. Zaki.
For these reasons, Plaintiff's experts raise triable issues of fact only with respect to the radiologist's interpretation and report of Plaintiff's September 8, 2015 CT scan. "When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (Stewart v. North Shore University Hospital at Syosset, 204 AD3d 858, 860 [2d Dept. 2022], citing Russell v. Garafalo, 189 AD3d 1100, 1102, [2d Dept. 2020]). The conflicting expert opinions on whether HHC's radiologist deviated from community standards by not including the cervical rib and post-stenotic dilatation findings, and whether that deviation resulted in a failure to properly diagnose and treat Plaintiff's condition in the two years she treated at Woodhull before her emergency thrombectomy on August 28, 2017, raise issues of fact and credibility which preclude summary judgment.
Accordingly, it is hereby:
ORDERED that the branch of Defendant New York City Health & Hospital Corp.'s motion (Seq. No. 3) seeking to dismiss otherwise viable claims in this action as untimely is DENIED; and it is further
ORDERED that Defendant New York City Health & Hospital Corp.'s motion (Seq. No. 3) for summary judgment is GRANTED TO THE EXTENT of dismissing Plaintiff's medical malpractice claims except those claims related to the radiological review and report of the September 8, 2015 CT scan in relation to the diagnosis and treatment of Plaintiff's cervical rib.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.